## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

IN RE: §
§ CHAPTER 11
BULLIONDIRECT, INC., §
§ CASE NO. 15-10940-tmd
Debtor. §

## NOTICE OF FILING OF
## EXECUTED ASSET PURCHASE AGREEMENT

Pursuant to the *Order (a) Authorizing Debtor to Enter Into an Agreement for the Sale of Assets Free and Clear of Claims, Interests, Liens and Encumbrances, (b) Approving Procedures and Notice with Respect to Sale, (c) Scheduling an Auction and Hearing for Approval of Sale, and (d) Granting Related Relief* (Doc. No. 155) entered on March 29, 2016, a draft Asset Purchase Agreement ("APA") was filed by Huseman-Murph on May 6, 2016. The APA was approved at the Sale Hearing on May 23, 2016, and the *Order Approving Debtor's Sale of Assets Free and Clear of Claims, Interests, Liens and Encumbrances Pursuant to 11 U.S.C. §§ 105 and 363* (Doc. No. 172) was entered on May 23, 2016. Attached is the executed APA.

DATED:      June 7, 2016

MARTINEC, WINN & VICKERS, P.C.
919 Congress Avenue, Suite 200
Austin, TX 78701- 2117
(512) 476-0750/FAX (512) 476-0753
martinec@mwvmlaw.com

By:  _/s/ J. Martinec_
Joseph D. Martinec
State Bar No. 13137500
ATTORNEYS FOR DEBTOR-IN-POSSESSION

F:\BullionDirect Inc\Asset Sales or Licensing\Sale Procedure Forms\Notice - Filing Executed Huseman-Murph Asset Purchase Agreement - 6-6-2016.docx

1

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Notice has been served via the Court's ECF Noticing System, by First Class Mail, postage prepaid, via e-mail or by facsimile transmission, if so indicated, to the creditors and parties in interest on the current Master Service List on the 7th day of June, 2016.

_____

Joseph D. Martinec

# ASSET PURCHASE AGREEMENT

by and among

**Platform Universe, LLC**

**a Texas limited liability company,**

**as Buyer**

and

**BullionDirect, Inc.**

**a Texas corporation,**

and

**Nucleo Development Company, LLC**

**a Texas limited liability company**

**as Sellers**

effective as of May 23, 2016

## TABLE OF CONTENTS

**Page**

**Article I**  Definitions and Interpretation..................................................................4
1.1  Definitions ............................................................................................4
1.2  Interpretation.......................................................................................8

**Article II**  Purchase and Sale of Assets ..................................................................9
2.1  Purchased Assets ................................................................................9
2.2  Excluded Assets..................................................................................9
2.3  Process for Assignment and Assumption of Contracts.........................10

**Article III**  Assumption of Liabilities ........................................................................11
3.1  Assumed Liabilities ...........................................................................11
3.2  Excluded Liabilities ...........................................................................11

**Article IV**  Consideration.......................................................................................11
4.1  Consideration.....................................................................................11
4.2  Payment .............................................................................................11
4.3  Allocation of Purchase Price .............................................................11
4.4  Contingent Payment Calculations and Payment.................................12

**Article V**  Representations and Warranties of Sellers ............................................14
5.1  Organization and Power of Sellers .....................................................14
5.2  Enforceability ....................................................................................15
5.3  Brokers or Finders .............................................................................15
5.4  No Implied or Other Representations or Warranties ...........................15

**Article VI**  Representations and Warranties of Buyer .............................................15
6.1  Organization and Power .....................................................................15
6.2  Enforceability ....................................................................................16
6.3  Brokers or Finders .............................................................................16
6.4  Buyer's Investigation.........................................................................16

**Article VII**  Covenants ............................................................................................16
7.1  Effectiveness of Representations and Warranties................................16
7.2  Conduct of Business ..........................................................................16
7.3  Buyer's Access ..................................................................................16
7.4  Expenses ............................................................................................17
7.5  Further Assurances ............................................................................17
7.6  Governmental Approvals....................................................................17
7.7  No Fiduciary Duty .............................................................................17
7.8  Discovery of Precious Metals.............................................................17
7.9  Standing and Right to Object..............................................................17
7.10  Exculpation Support ..........................................................................18

**Article VIII**  Conditions to Closing ..........................................................................18

i

| | | |
|---|---|---|
| 8.1 | Conditions to Obligations of All Parties | 18 |
| 8.2 | Conditions to Buyer's Obligations | 18 |
| 8.3 | Conditions to Sellers' Obligations | 19 |
| **Article IX** | Closing and Termination | 20 |
| 9.1 | Closing | 20 |
| 9.2 | Termination | 20 |
| 9.3 | Effect of Termination | 21 |
| **Article X** | Tax Matters | 21 |
| 10.1 | Filing of Returns | 21 |
| 10.2 | Transaction Taxes | 21 |
| 10.3 | Tax Refunds | 22 |
| 10.4 | Tax Prorations | 22 |
| **Article XI** | General Provisions | 22 |
| 11.1 | Bankruptcy Court Approval | 22 |
| 11.2 | Notices | 22 |
| 11.3 | Survival of Representations and Warranties | 23 |
| 11.4 | Binding Effect and Third-Party Beneficiaries | 23 |
| 11.5 | Headings | 24 |
| 11.6 | Exhibits and Schedules | 24 |
| 11.7 | Counterparts | 24 |
| 11.8 | Governing Law | 24 |
| 11.9 | Waivers | 24 |
| 11.10 | Pronouns | 24 |
| 11.11 | Modification | 24 |
| 11.12 | Assignment | 24 |
| 11.13 | Entire Agreement | 24 |
| 11.14 | Severability | 24 |

1797009.2/SPA/40278/0101/052316

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is dated as of May 23, 2016 by and among Platform Universe, LLC, a Texas limited liability company ("***Buyer***"), BullionDirect, Inc., a Texas Corporation ("***BDI***"), and Nucleo Development Company, LLC, a Texas limited liability company ("***Nucleo Development***" and, together with BDI, "***Sellers***"). Buyer and Sellers are also referred to herein individually as a "***Party***" and, collectively, as the "***Parties***".

## RECITALS:

A.      BDI is debtor-in-possession in the Chapter 11 reorganization case, Case No. 15-10940-tmd (the "***Chapter 11 Case***") pending in the United States Bankruptcy Court for the Western District of Texas, Austin Division (the "***Bankruptcy Court***").

B.      Nucleo Development is a wholly-owned Subsidiary of BDI.

C.      Prior to filing the Chapter 11 Case, Sellers were, among other things, engaged in the development, management and operation of a Web-based exchange for the buying, selling and order-matching of Precious Metals (the "***Business***").

D.      On or about March 8, 2016, BDI and Cheryl L. Huseman ("***Huseman***") and C. Jack Murph ("***Murph***"), predecessors-in-interest to Buyer, with the consent of the Official Committee of Unsecured Creditors ("***Committee***") in the Chapter 11 Case, entered into that certain Term Sheet attached as an exhibit to the Procedures Order ("***Term Sheet***"). Pursuant to the Term Sheet, BDI agreed to sell certain assets of the BDI bankruptcy estate under an asset purchase agreement and subject to the terms and conditions of a bid procedure and auction set forth in *Debtor's Motion for Order (A) Authorizing Debtor to Enter Into An Agreement for The Sale of Assets Free and Clear of Claims, Interests, Liens and Encumbrances, (B) Approving Procedures and Notice with Respect to Sale, (C) Scheduling and Auction and Hearing for Approval of Sale and (D) Granting Related Relief* ("***Sale Motion***"), filed in the Chapter 11 Case at Docket No. 143. On March 29, 2016, the Bankruptcy Court entered an order ("***Procedures Order***") (Docket No. 155) granting certain relief sought in the Sale Motion, to wit: Approving the sale of certain assets to Buyer subject to a bid procedure and auction process if necessary, approving Buyer as a Stalking Horse Bidder as defined in the Sale Motion, and setting the sale of assets defined in the Term Sheet and Procedures Order for hearing on May 20, 2016 (the "***Sale Hearing***").

E.      Pursuant to the Term Sheet and Procedures Order, Sellers desire to sell, transfer, convey, assign and deliver to Buyer, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets, together with the Assumed Liabilities, upon the terms and subject to the conditions set forth in this Agreement.

F.      The Purchased Assets will be sold pursuant to the Sale Order, which shall, *inter alia*, incorporate the terms of this Agreement.

G.      Subject to the Bankruptcy Court's entry of the Sale Order, Buyer will purchase from the Sellers, and the Sellers will sell, transfer, convey, assign and deliver to the Buyer, all of

the Purchased Assets together with the Assumed Liabilities, upon the terms and subject to the conditions set forth in this Agreement.

H.    The Parties have agreed on the terms and conditions of a sale and assignment of the Purchased Assets to Buyer and the assumption of the Assumed Liabilities by Buyer on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and of their mutual covenants and agreements set forth in this Agreement, the Parties do hereby agree as follows:

### Article I
### Definitions and Interpretation

1.1    Definitions.

When used in this Agreement, the following terms in all of their tenses shall have the meanings assigned to them below:

"*Additional Capitalizations*" is defined in Section 4.4.

"*Affiliate*" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"*Allocation*" is defined in Section 4.3.

"*Assumed Contracts*" is defined in Section 2.1.

"*Assumed Liabilities*" is defined in Section 3.1.

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended, 11 U.S.C. §§ 101, *et. seq.*

"*Bankruptcy Court*" is defined in the Recitals and includes such other courts exercising competent jurisdiction over the Chapter 11 Case involving Sellers.

"*BDI*" is defined in the Preamble.

"*Bill of Sale, Assignment and Assumption Agreement*" means the Bill of Sale, Assignment and Assumption Agreement executed by each Seller, in a form reasonably acceptable to Buyer and Sellers.

"*Books and Records*" is defined in Section 2.1.

"***Business***" is defined in the Recitals.

"***Buyer***" is defined in the Preamble.

"***Calculation Period***" is defined in <u>Section 4.5</u>.

"***Cash Deposit***" is defined in <u>Section 4.1</u>.

"***Chapter 11 Case***" is defined in the Recitals.

"***Closing***" is defined in <u>Section 9.1</u>.

"***Closing Date***" is defined in <u>Section 9.1</u>.

"***Closing Date Payment***" is <u>Section 4.1</u>.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Committee***" is defined in the Recitals.

"***Contemplated Transactions***" means all of the transactions contemplated by this Agreement.

"***Contingent Payment***" is defined in <u>Section 4.55</u>.

"***Contingent Payment Period***" is defined in <u>Section 4.55</u>.

"***Contingent Payment Percentage***" is defined in <u>Section 4.55</u>.

"***Contingent Payment Year***" is defined in <u>Section 4.55</u>.

"***Contract***" means any written commitment, understanding, instrument, lease, pledge, mortgage, indenture, license, agreement, purchase or sale order, contract, promise or similar arrangement evidencing or creating any legally binding obligation.

"***Creditors of BDI***" means those Persons who are holders of the Allowed Claims in the Chapter 11 Case. "**Claim**" as specifically used herein shall have the same definition as set forth in 11 U.S.C. Section 101(5). "**Allowed**" as specifically used herein shall mean, with reference to a Claim or any portion thereof (a) a Claim against BDI, proof of which, if required, was filed on or before the Claims bar date set forth in the Chapter 11 Case, which is not disputed; (b) if no proof of Claim was so filed, a claim against BDI which has been or hereafter is listed by BDI in its bankruptcy schedules as liquidated, in a known amount and not disputed or contingent and on account of which payment has not been made; (c) an unknown Claim allowed by a final order in the Chapter 11 Case by the Bankruptcy Court or (d) a Claim included the final order in the Chapter 11 Case or in any order confirming the plan in the Chapter 11 Case. An Allowed Claim does not include any Claim, or portion thereof, which is a disallowed Claim or which has been subsequently withdrawn, disallowed, released or waived by the holder thereof or pursuant to a final order of the Bankruptcy Court and shall not include any amount for punitive or exemplary damages, penalties, fines or post-bankruptcy-petition interest.

"*Excluded Assets*" is defined in <u>Section 2.2</u>.

"*Excluded Contracts*" means all Contracts to which either Seller is a party and which are not Assumed Contracts.

"*Exculpation Clause*" is defined in <u>Section 7.12</u>.

"*Full Release*" is defined in <u>Section 8.2(f)(i)</u> and **Exhibit "B"**.

"*Governmental Approvals*" means any approval, consent, permit, license, waiver, or other authorization issued, granted, given or otherwise made available by or under any Governmental Authority or pursuant to any Law.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"*Huseman*" is defined in the Recitals.

"*Intellectual Property*" means any (a) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable; (c) trade secrets and confidential know-how; (d) patents and patent applications; (e) websites and internet domain name registrations; (f) any and all computer software and code, including all new versions, updates, revisions, improvements and modifications thereof, whether in source code, object code, or executable code format, including systems software, application software (including mobile apps), firmware, middleware, programming tools, scripts, routines, interfaces, libraries, and databases; (g) all related specifications and documentation, including inventor or developer notes, comments and annotations, user manuals, policies, procedures and training materials, in electronic or hard copy, relating to any of the foregoing; and h) all other intellectual and industrial property rights and assets, and all rights, interests and protections that are associated with any of the foregoing.

"*Intellectual Property Claims*" means all claims past, pending, asserted, threatened and future for infringement, dilution, unfair competition, misappropriation and any other intellectual property-related claims, against a third-party Person for violation of any rights arising from or related to the Intellectual Property.

"*Intellectual Property Rights*" means all rights of Sellers and their Subsidiaries in and to (i) any Intellectual Property, including any licenses in, or otherwise related to, any Intellectual Property owned by third parties, including those listed on **Exhibit "A"** and (ii) any Intellectual Property Claims.

"***Law***" means any statute, law, ordinance, regulation, rule, code, Order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"***Lien***" means any lien, charge, covenant, condition, easement, adverse claim, demand, encumbrance, limitation, security interest, option, pledge, or any other title defect.

"***Murph***" is defined in the Recitals.

"***Net Profits***" is defined in Section 4.55.

"***Nucleo Development***" is defined in the Preamble.

"***Order***" shall mean any order, judgment, injunction, award, decree or writ of any court or Governmental Authority.

"***Party***" and "***Parties***" are defined in the Preamble.

"***Permits***" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities.

"***Person***" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"***Precious Metals***" means a rare, naturally occurring metallic chemical element of high economic value, including gold, silver, platinum and palladium;

"***Procedures Order***" is defined in the Recitals.

"***Purchase Price***" is defined in Section 4.1.

"***Purchased Assets***" is defined in Section 2.1 and includes **Exhibit "A"**.

"***Sale Date***" means the date that the Sale Order is entered by the Bankruptcy Court.

"***Sale Hearing***" is defined in the Recitals.

"***Sale Motion***" is defined in the Recitals.

"***Sale Order***" means the final, non-appealable order of the Bankruptcy Court, to be issued by the Bankruptcy Court pursuant to Sections 363, 365 and, to the extent possible, section 1146(c), of the Bankruptcy Code in a form substantially (i) approving this Agreement and the Contemplated Transactions, (ii) approving the sale of the Purchased Assets to Buyer free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to Buyer of any Assumed Contracts and (iv) finding that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

"*Sellers*" is defined in the Preamble.

"*Subsidiary*" as to any Person, means any corporation, partnership, limited liability company, joint venture, trust or estate of or in which more than 50% of (a) the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class of such corporation may have voting power upon the happening of a contingency), (b) the interest in the capital or profits of such partnership, limited liability company, or joint venture or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled through one or more intermediaries, or both, by such Person.

"*Tax*" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"*Tax Returns*" means any return, report or declaration filed with or submitted to any Governmental Authority in connection with the assessment, collection or payment of any Tax.

"*Terminate Date*" is defined in Section 9.2.

"*Transaction Taxes*" is defined in Section 10.2.

"*Vault*" means that certain security vault of BDI pursuant to certain agreements between BDI and Diamond State Depository, LLC d/b/a International Depository Services of Delaware.

1.2    Interpretation.    When a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference shall be to a Section, Schedule or Exhibit of this Agreement unless otherwise indicated. Whenever the words "included," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation." All terms defined in this Agreement shall have the meanings assigned to them herein in all of their tenses. Unless otherwise indicated, all references to dollars refer to United States dollars. The Parties acknowledge that all Parties have participated in the drafting and preparation of this Agreement and agree that any rule of construction to the effect that ambiguities are to be construed against the drafting party shall not be applied to the construction or interpretation of this Agreement.

## Article II
## Purchase and Sale of Assets

2.1     Purchased Assets.  Subject to the terms and conditions of this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, effective as of the Closing, Sellers shall sell, convey, transfer, assign and deliver to Buyer, free and clear of all Liens, and Buyer shall purchase, all right, title and interest in and to the following assets of Sellers (collectively, the "**Purchased Assets**"):

(a)     All of Sellers' right, title, and interest in and to the assets set forth on **Exhibit "A"**;

(b)     The Intellectual Property Rights;

(c)     A transfer of all claims, rights, and causes of action of BDI and BDI's Subsidiaries against Nucleo Development, in each case whether asserted or unasserted, known or unknown, or contingent or otherwise, and whether accruing before or after the Closing Date;

(d)     All of the Contracts listed on **Exhibit "A"** and all rights of any kind relating thereto and such other Contracts as Buyer shall elect to assume pursuant to Section 2.3 (collectively, the "**Assumed Contracts**");

(e)     All of Sellers' rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(f)     A copy of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that relate to the Business or Purchased Assets ("**Books and Records**"), provided however, that the Purchased Assets do not include any communications or records of communications with any Government Authority occurring after the commencement of the Chapter 11 Case, except for any communications related to regulatory approvals to operate, and do not include any documents, communications, or materials created by, created for, or received by attorneys for Sellers in connection with the Chapter 11 Case or other materials that relate to the Chapter 11 Case and are subject to any attorney-client privilege among Sellers and their counsel; and

(g)     All goodwill associated with any of the assets described in the foregoing clauses.

2.2     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, Sellers shall not sell, convey, transfer, assign or deliver, and Buyer shall not purchase or acquire any assets of Sellers other than the Purchased Assets.  Without limiting the generality of the foregoing, the Buyer shall not acquire any of the following assets (collectively, the "**Excluded Assets**"):

(a)     All Sellers' cash, bank deposits, bank accounts, certificates of deposit, pre-paid amounts with third parties, vendor deposits, customer deposits, performance bonds and cash equivalents (including marketable securities and short term investments);

(b)     All Sellers' personal property in the Vault and all Seller's interests in and to rights to the Vault and its contents except for Purchased Assets;

(c)     All Sellers' promissory notes;

(d)     All Precious Metals in Sellers' possession or owned by Sellers;

(e)     All rights of Sellers under this Agreement;

(f)     The Excluded Contracts;

(g)     All insurance policies of each Seller and all rights thereunder (including any and all insurance refunds or claims made under such policies relating to the Purchased Assets on or before the Closing Date);

(h)     All Tax assets and attributes and all claims which any Seller, an Affiliate of any Seller, or the Business may have, on or after the date hereof, against any Governmental Authority for refund or credit of any type with respect to Taxes applicable to the Business for periods ending on or prior to the Sale Date, including any Tax refund due to Sellers with respect to periods ending prior to the Sale Date; and

(i)     With the exception of those claims, rights, and causes of action set forth in Sections 2.1(b) and 2.1(c) of the Purchased Assets, all rights to any action, suit or claim of any nature available to or being pursued by Sellers, whether arising by way of counterclaim or otherwise, including without limitation (i) claims for breach of contract, or breach of fiduciary duty or tort claims and (ii) all Sellers' claims or causes of action, including those vested in any Seller under Sections 541, 542, 544, 545, 547, 548 and 549 (and, to the extent applicable for remedies, Sections 550 and 551) of the Bankruptcy Code.

2.3     Process for Assignment and Assumption of Contracts.

(a)     Sellers agree, pursuant to Section 365 of the Bankruptcy Code, to assume and then to sell, assign, transfer and convey to Buyer all Assumed Contracts. Should Buyer or Sellers identify any Contracts of Sellers not identified on **Exhibit "A"**, at Buyer's request, provided that such request is (i) acceptable to the Bankruptcy Court, and (ii) made to Sellers prior to the Bankruptcy Court's entry of the Sale Order, Sellers shall take commercially reasonable efforts to assume and assign such Contracts to Buyer pursuant to the terms of this Agreement and the Procedures Order, including obtaining any required third party consents.

(b)     Buyer shall be responsible for any and all cures or other payments required for Sellers to assume and assign the Assumed Contracts to Buyer and Buyer shall be responsible for providing evidence as to the adequate assurance of future performance required under Section 365 of the Bankruptcy Code. The Sale Order shall provide that the assumption and assignment to Buyer of the Assumed Contracts is approved, subject only to (i) payment by

Buyer of all cures or other payments or actions required for Sellers to assume and assign the Assumed Contracts to Buyer and (ii) Buyer's right to exclude any Contract from the definition of Assumed Contracts.

(c)     If any non-debtor party to an Assumed Contract objects to the assumption and assignment of such Contract, and such party's consent is required under Section 365(c) for the assumption and assignment of such Contract to Buyer, Buyer agrees that such Contract shall be deemed an Excluded Asset, without any adjustment to the Purchase Price, unless such consent is obtained.  Sellers shall take commercially reasonable efforts to obtain any such consent, provided that Sellers shall have no obligation to obtain any such consent.

(d)     Prior to Closing, Buyer shall have the right to exclude any Contract from the definition of Assumed Contracts and add such Contract to the definition of Excluded Contracts.

### Article III
### Assumption of Liabilities

3.1     Assumed Liabilities.   Upon the terms and subject to the conditions of this Agreement, Buyer shall assume, pay, perform and discharge when due, effective as of the Closing Date, all of Sellers' liabilities, responsibilities and obligations under the Assumed Contracts, if any, regardless of whether such are fixed, contingent or otherwise (the "*Assumed Liabilities*").  For the avoidance of doubt, Buyer shall not assume any liabilities other than the Assumed Liabilities.

3.2     Excluded Liabilities.   Each Seller shall remain responsible for its respective liabilities, responsibilities and obligations not specifically included in the Assumed Liabilities.

### Article IV
### Consideration

4.1     Consideration.   The consideration to be paid by Buyer to Sellers, provided for Seller's benefit, for the Purchased Assets is (i) $100,000.00 (the "*Purchase Price*"), (ii) the Contingent Payments, if any, (iii) the Additional Capitalizations (as defined below), and (iv) the assumption by Buyer of the Assumed Liabilities, if any.

4.2     Payment.  Buyer shall pay the Purchase Price to Sellers as follows:

(a)     $10,000 (the "*Cash Deposit*") is to be held by BDI as security for the performance by Buyer of its obligations under this Agreement. Sellers acknowledge that the Cash Deposit has already been paid.

(b)     An amount equal to the Purchase Price less the Cash Deposit (the "*Closing Date Payment*") in the amount of $90,000 will be paid at the Closing by wire transfer of immediately available funds to the accounts designated by Sellers.

4.3     Allocation of Purchase Price.  Prior to or on the Closing Date, the Parties shall agree to the allocation of the appropriate portions of the Purchase Price, Assumed Liabilities and

other relevant items among the Purchased Assets, including goodwill and other assets, in accordance with Code Section 1060 and any comparable provisions of state or local Law, as appropriate (the "*Allocation*"), which Allocation shall be binding upon the Parties and which will be attached to this Agreement as Schedule 4.3. The Parties and their respective Affiliates shall report, act and file Tax Returns in all respects and for all purposes consistent with such Allocation. Each Party shall furnish the other Party with such cooperation and existing information as is reasonably requested by the other Party in connection with the preparation of the Allocation described in this Section 4.3. The Parties covenant and agree that (i) neither Buyer nor Sellers shall assert that this Section 4.3 was not separately bargained for at arm's length and in good faith, and (ii) neither Buyer nor Sellers will take any position before any Governmental Authority, in any judicial proceeding, or in any Tax Return that is in any way inconsistent with such Allocation unless otherwise required by Law.

4.4     Additional Capitalizations. As additional consideration for the Purchased Assets, in order to help maximize the potential Contingent Payments, Huseman and Murph shall provide Buyer with an equity investment of at least $100,000 upon the Closing Date. In addition, Huseman and Murph shall provide the Buyer with an additional loan or equity investment, at Buyer's option, of at least $100,000 (each such investment being referred to as an "Additional Capitalization") if, within the first twelve (12) months of Business operations:

> (i)     In the reasonable judgment of the Buyers, activities realized prior to the expenditure of the first $100,000 in Additional Capitalizations yield positive results that warrant further investment;

> (ii)    During the first six (6) months of Business operations by Buyer, the Business conducts at least 3,000 transactions; and

> (iii)   During the first twelve (12) months of Business operations by Buyer, the Business conducts at least 5,000 transactions.

4.5     Contingent Payment Calculations and Payment.

(a)     *Contingent Payments*. As additional consideration for the Purchased Assets, at such times as provided in Section 4.5(b), Buyer shall pay to BDI or its assigns with respect to each Calculation Period within the Contingent Payment Period an amount, if any (each, a "*Contingent Payment*"), equal to the Contingent Payment Percentage for the applicable Contingent Payment Year multiplied by the Net Profits of Buyer. For the purposes hereof "*Net Profits*" is equal to revenue minus all operating expenses, minus interest payable, minus taxes payable as calculated on an annual basis for Buyer's operations relating to the Business. Buyer shall use its reasonable best efforts to maximize the total Contingent Payments paid to Seller consistent with the Business Judgment Rule.

(b)     *Timing of Contingent Payments*. Any Contingent Payment that Buyer is required to pay pursuant to Section 4.5(a) hereof shall be paid in full no later than forty-five (45) days following the date upon which Buyer's written report containing its determination of Net Profits for the applicable Calculation Period is provided to BDI, or if subject to the dispute resolution mechanism herein, then 10 days after the resolution thereof. In BDI's sole discretion,

it may require Buyer to provide its representatives with reasonable access to Buyer's books and records for the purpose of validating Buyer's calculations of Net Profits. If BDI disputes such calculations, it shall provide Buyer with its own written report outlining the differences between its calculations and Buyer's calculations within fifteen (15) days after it has been provided with the books and records necessary to validate Buyer's report. If Buyer does not agree with BDI's report, it shall notify BDI within ten (10) days after receipt of Buyer's report and either party may submit the dispute to an independent firm of public accountants reasonably acceptable to both parties (and split the fee for such independent firm), or if the parties are unable to agree on such firm, then the dispute may be submitted to the Bankruptcy Court. Whether the dispute is submitted to such firm or the Bankruptcy Court, the determination by such firm or Bankruptcy shall be a final, non-appealable decision and the parties agree to be bound by such decision without right of appeal to any authority. Buyer shall pay to BDI the applicable Contingent Payment in cash by wire transfer of immediately available funds to the bank account that BDI or its assigns designates.

(c) *Contingent Payment Schedule.* Subject to the early termination provisions in Section 4.5(e), BDI or its assigns shall be eligible to receive the Contingent Payments during the Contingent Payment Period. Buyer will notify BDI upon Buyer's commencement of Business operations, which shall mark the beginning of the Contingent Payment Period. Buyer shall commence Business operations within one (1) year of the Closing Date. During the Contingent Payment Period, the Contingent Payment Percentage for each Contingent Payment Year will calculated as followings:

| *"Contingent Payment Year"* | *"Contingent Payment Percentage"* |
|---|---|
| Year 1 | 80.00% |
| Year 2 and 3 | 60.00% |
| Years 4 through 7 | 50.00% |

(i) *"Contingent Payment Period"* means a seven-year period beginning on the Commencement of Business operations and ending seven years later.

(ii) *"Calculation Period"* means each 365 day-year of the Contingent Payment Period.

(d) *Character of Contingent Payments.* The parties hereto acknowledge and agree that (i) the contingent rights to receive any Contingent Payment shall not be represented by any form of certificate or other instrument, are not transferable, and do not constitute an equity or ownership interest in Buyer, (ii) Sellers shall not have any rights as a security-interest holder of Buyer as a result of Sellers' contingent right to receive any Contingent Payment hereunder, (iii) no interest is payable with respect to any Contingent Payment, and (iv) any Contingent Payments made by the Buyer after Closing shall be treated by all Parties as an addition to the Purchase Price hereunder, except as otherwise required by law.

(e)    *Early Termination of Contingent Payment Period.* Buyer's obligation to make any future Contingent Payments will automatically terminate and Sellers right to receive any unearned and unpaid Contingent Payments shall automatically terminate if:

(i)    BDI or its assigns receives Contingent Payments equal to the amount of the Allowed Claims of the Creditors of BDI;

(ii)    Buyer sells all or substantially all of its assets to a bona fide third-party purchaser;

(iii)    the current equity owners of Buyer sell, or contractually obligate themselves to sell, all or substantially all of their equity-ownership interests in Buyer to one or more bona fide third-party purchasers, provided that the automatic termination shall occur on the date of closing of such sale;

In the event of 4.5(e)(ii) or 4.5(e)(iii) above, Buyer's obligation to make future Contingent Payments will not terminate until BDI or its assigns receive: (1) a final pro-rated Contingent Payment for the portion of the current Contingent Payment Year that precedes the closing date of such sale, to be paid from the net sale proceeds, and (2) after deduction of the final pro-rated Contingent Payment from any net sale proceeds, the Contingent Payment Percentage for the year in which the event occurs multiplied by the remaining net proceeds of the transaction constituting such sale, including all net proceeds payable to the Buyer or to any of its equity owners.

(f)    *Disclosures Regarding Sales Processes.* Buyer, Huseman, and Murph shall provide Seller with prompt written notice following Buyer's execution of any letter of intent or purchase agreement to sell under 4.4(e)(ii) or (iii) hereof. Buyer, Huseman, and Murph shall provide such notice at least twenty-one (21) days prior to any sale agreement closing or asset or equity interest transfer occurring.

## Article V
## Representations and Warranties of Sellers

Each Seller, severally and not jointly, hereby represents and warrants to Buyer as follows:

5.1    Organization and Power of Sellers. BDI is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas. Nucleo Development is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. Each Seller has full corporate or company power, as applicable, to: (a) own, lease and operate the Purchased Assets and carry on the Business as and where such assets are now owned or leased and as the Business is presently being conducted; and (b) execute, deliver and perform this Agreement and all other agreements and documents to be executed and delivered by such Seller in connection herewith, subject to and after giving effect to the approval of the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.

5.2     Enforceability.  All requisite action to approve, execute, deliver and perform this Agreement has been taken by Sellers.  This Agreement and each other agreement and document delivered by each Seller in connection herewith have been duly executed and delivered by such Seller and constitute the binding obligation of such Seller, enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other laws affecting creditors' rights generally and by principles of equity.

5.3     Brokers or Finders.  No Person is or will become entitled, by reason of any agreement or arrangement entered into or made by or on behalf of Sellers, to receive any commission, brokerage, finder's fee or other similar compensation arrangement in connection with the consummation of the Contemplated Transactions.

5.4     No Implied or Other Representations or Warranties.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT SELLERS AND ANY OF THEIR RESPECTIVE AFFILIATES ARE NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO ANY OF THE ASSETS, AND IT IS UNDERSTOOD THAT EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, BUYER TAKES ALL PURCHASED ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.  NEITHER SELLERS NOR ANY STOCKHOLDERS, MEMBERS, EMPLOYEES, DIRECTORS, OFFICERS OR REPRESENTATIVES OF THE SELLERS HAVE MADE, AND SHALL NOT BE DEEMED TO HAVE MADE, ANY REPRESENTATIONS OR WARRANTIES IN ANY PRESENTATION OF THE BUSINESS OF SELLERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREIN, AND NO STATEMENT MADE IN ANY SUCH PRESENTATION SHALL BE DEEMED A REPRESENTATION OR WARRANTY HEREUNDER OR OTHERWISE.  IT IS EXPRESSLY UNDERSTOOD THAT ANY COST ESTIMATES, PROJECTIONS, PREDICTIONS OR FORWARD-LOOKING STATEMENTS CONTAINED IN ANY DATA, FINANCIAL INFORMATION, MEMORANDA OR OFFERING MATERIALS OR PRESENTATIONS ARE NOT AND SHALL NOT BE DEEMED TO BE OR INCLUDE PRESENTATIONS OR WARRANTIES OF SELLERS OR OF ANY STOCKHOLDER, MEMBER, EMPLOYEE, DIRECTOR, OFFICER, OR REPRESENTATIVE OF SELLERS.

### Article VI
### Representations and Warranties of Buyer

Buyer hereby represents and warrants to Sellers as follows:

6.1     Organization and Power.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas. Buyer has full power to execute, deliver and perform this Agreement and all other agreements and documents to be executed and delivered by it in connection herewith.

6.2     Enforceability. All requisite action to approve, execute, deliver and perform this Agreement and each other agreement and document delivered by Buyer in connection herewith has been taken by Buyer. This Agreement and each other agreement and document delivered by Buyer in connection herewith have been duly executed and delivered by Buyer and constitute the binding obligations of Buyer enforceable in accordance with their respective terms.

6.3     Brokers or Finders. No Person is or will become entitled, by reason of any agreement or arrangement entered into or made by or on behalf of Buyer, to receive any commission, brokerage, finder's fee or other similar compensation arrangement in connection with the consummation of the Contemplated Transactions.

6.4     Buyer's Investigation. Buyer represents that it is a sophisticated entity that was advised by knowledgeable counsel and financial advisors and hereby acknowledges that it has conducted an investigation of the Purchased Assets.     Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges that it is accepting the Purchased Assets in their present condition and locations and with their present operating capabilities.     Buyer acknowledges that Sellers make no warranty, express or implied, as to the condition of the Purchased Assets except as expressly set forth in this Agreement. Buyer has not relied upon, and Sellers shall not be liable for or bound in any manner by, any express or implied verbal or written information, warranties, guarantees, promises, statements, inducements, representations or opinions pertaining to the Business or the Purchased Assets, except as may be contained in this Agreement. Buyer has inspected, or waived its right to inspect, the Purchased Assets for all purposes and satisfied itself as to their condition. Buyer is relying solely upon its own inspection of the Purchased Assets, and Buyer shall accept all of the same in their as is, where is, condition. Buyer acknowledges that the representations and warranties of Sellers contained in this Agreement constitute the sole and exclusive representations and warranties of Sellers to Buyer in connection with this Agreement and the Contemplated Transactions, and Buyer acknowledges that all other representations and warranties are specifically disclaimed and may not be relied upon or serve as a basis for a claim against any Seller.

**Article VII**
**Covenants**

7.1     Effectiveness of Representations and Warranties. Subject to the restrictions set forth in the Bankruptcy Code or Orders of the Bankruptcy Court, from the date hereof through the Closing Date, each Seller shall maintain the Purchased Assets in such a manner so that the representations and warranties contained in Article V shall continue to be true and correct on and as of the Closing Date as if made on and as of the Closing Date.

7.2     Conduct of Business. Except to the extent required by the Bankruptcy Court, no Seller shall, except as otherwise permitted by the Bankruptcy Code or an Order of the Bankruptcy Court (a) permit any of the Purchased Assets to be subjected to any additional Lien; or (b) sell or dispose of any Purchased Assets.

7.3     Buyer's Access. From the date hereof until the Closing Date, Sellers shall provide Buyer and its representatives reasonable access during normal business hours and upon reasonable advance notice to the Purchased Assets and all books and records and such other

information and Persons relating to the Business and Purchased Assets as Buyer may reasonably request.

7.4    Expenses.  Except to the extent otherwise specifically provided in this Agreement, each Party shall bear its respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel and accountants.

7.5    Financial Reporting.  Buyer shall provide Sellers and their successors quarterly financial statements of Buyer, which need not be audited, within thirty (30) days after the end of each calendar quarter during the Contingent Payment Period.  Buyer shall provide Sellers and their successors with further Buyer financial information, including information about efforts to sell or market for sale the Buyer's assets or the equity interests in the Buyer, that may be reasonably requested by Sellers and their successors.

7.6    Further Assurances.

(a)    Each Seller agrees that, at any time and from time to time after the Closing, it will, upon the request of Buyer and at Buyer's sole expense, do all such further acts as may be reasonably required to further transfer and assign to Buyer any of the Purchased Assets, or to vest in Buyer good and marketable title to the Purchased Assets.

(b)    Buyer agrees that, at any time and from time to time after the Closing, it will, upon the request of any Seller, do all such further acts as may be reasonably required to cause Buyer to assume the Assumed Liabilities, if any, in accordance with this Agreement and as may otherwise be appropriate to carry out the transactions contemplated by this Agreement.

7.7    Governmental Approvals.  Buyer shall be solely responsible for obtaining, and for payment of all costs relating to, any and all Governmental Approvals required in connection with the Contemplated Transactions.

7.8    No Fiduciary Duty.  Sellers acknowledge and agree that Buyer, Huseman or Murph do not and will not owe any fiduciary duties to Sellers or their assigns as a result of this Agreement, the future performance and operation of the Business or the future payment of any Contingent Payment.  This provision does not impair or affect any obligations of Buyer, Huseman, or Murph under this Agreement and does not impair or affect any obligation of Huseman and Murph to the Buyer or the rights of Sellers as creditors of Buyer under this Agreement.  Buyer, Huseman, and Murph shall act in good faith and exercise reasonable business judgment in carrying out this Agreement.

7.9    Discovery of Precious Metals.  If Buyer discovers any Precious Metals owned by Sellers, Buyer (i) shall immediately provide notice of the discovery to BDI or its successors and (ii) shall use commercially reasonable efforts to assist BDI or its successors in recovering the Precious Metals.

7.10    Standing and Right to Object.  Sellers acknowledge and agree that Buyer shall be a party-in-interest and have standing and rights to object to any plan of reorganization and order

confirming the plan in the Chapter 11 Case, but only to the extent the plan may impair the rights of Buyer under this Agreement or applicable law.

7.11    Exculpation Support. Sellers acknowledge and agree to support the inclusion of an Exculpation Clause described on page 4 of the Term Sheet in plan of reorganization in the Chapter 11 Case ("*Exculpation Clause*"). The Persons named to be exculpated in the Exculpation Clause are intended third-party beneficiaries of this Section 7.1111.

7.12    Each of Sellers covenants and agrees that it has not, and will not prior to or after closing, disclose the substance of any of the Purchased Assets to any third party, including but not limited to the customer lists and Intellectual Property Rights. This provision shall survive the Closing Date notwithstanding any contrary provision in this Agreement.

**Article VIII**
**Conditions to Closing**

8.1    Conditions to Obligations of All Parties. The obligation of each Party to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by each Party:

(a)    The Sale Order shall have been entered by the Bankruptcy Court approving Buyer as the winning bidder pursuant to the Procedures Order.

(b)    On the Sale Date, there shall be no Order of any nature which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

8.2    Conditions to Buyer's Obligations. The obligation of Buyer to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by Buyer:

(a)    The Sale Order shall name Buyer as the winning bidder and be in form and substance satisfactory to Buyer in its sole discretion;

(b)    As determined in Buyer's sole discretion, there shall exist no known or anticipated impediments to Buyer obtaining the necessary Permits and approvals from Governmental Authorities required to operate the Business using the Purchased Assets;

(c)    Buyer shall have located and retained management and staff capable of operating the Business using the Purchased Assets in a manner satisfactory to Buyer in its sole discretion;

(d)    Each of the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as though made on the Closing Date.

(e)     Sellers shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

(f)     Each Seller shall have delivered to, or caused to be delivered to, Buyer the following documents, duly executed by such Seller (where appropriate):

(i)     Sellers and their Affiliates and Subsidiaries shall deliver a release of all claims, rights, and causes of action that Sellers and their Affiliates and Subsidiaries have against Huseman and Murph in the form of the release attached hereto as **Exhibit "B"** ("*Full Release*");

(ii)     A duly executed counterpart of the Bill of Sale, Assignment and Assumption Agreement;

(iii)     A certificate, dated the Closing Date and signed by an authorized officer of such Seller, certifying that the conditions contained in Sections 8.2(a) and 8.2(e) have been satisfied;

(iv)     A copy of the Sale Order; and

(v)     Such other document(s) or instruments as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

8.3     Conditions to Sellers' Obligations. The obligation of each Seller to consummate the Contemplated Transactions on the Closing Date is subject to the fulfillment on or prior to the Sale Date of the following conditions, any one or more of which may be waived by Sellers:

(a)     Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Sale Date with the same effect as though made on the Closing Date.

(b)     Buyer shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)     Buyer shall deliver the Closing Date Payment to Sellers as specified in Section 4.2(b).

(d)     Buyer shall have delivered to, or caused to be delivered, to Sellers the following documents, duly executed by Buyer (where appropriate):

(i)     A duly executed counterpart of the Bill of Sale, Assignment and Assumption Agreement;

(ii)     A certificate, dated the Sale Date and signed by an authorized officer of Buyer, certifying that the conditions contained in Sections 8.3(a) and 8.3(b) have been satisfied; and

(iii)     Such other document(s) or instruments as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

## Article IX
## Closing and Termination

9.1     Closing. The closing (the "*Closing*") of the Contemplated Transactions shall be held on or within three business days after the Sale Date (or such other date as the Parties may agree in writing), at the offices of Strasburger & Price, LLP, 720 Brazos Street, Suite 700, Austin, Texas 78701. At Closing, (i) the Buyer shall deliver the Closing Date Payment and (ii) the Buyer and Sellers shall exchange the documents listed in Sections 8.2(f) and 8.3(d) dated effective as of the Closing Date. The date on which the Closing occurs is referred to as the "*Closing Date*."

9.2     Termination. This Agreement and the Contemplated Transactions may not be terminated except as follows:

(a)     Upon the mutual written consent of Sellers and Buyer (subject to the approval of the Bankruptcy Court);

(b)     By Sellers if:

(i)     Sellers are not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Section 8.1 or Section 8.3 and such breach is not curable or has not been cured with fifteen (15) days' prior written notice thereof to Buyer; or

(ii)     any of the conditions set forth in (A) Section 8.1 or (B) Section 8.3 shall not have been fulfilled by June 30, 2016 (the "*Termination Date*"), unless such failure shall be due to the failure of Sellers to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by them prior to the Closing;

(c)     By Buyer if:

(i)     if Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Sellers pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Section 8.1 or Section 8.2 and such breach is not curable or has not been cured within fifteen (15) days' written notice thereof to Sellers; or

(ii)     any of the conditions set forth in Section 8.1 or Section 8.2 shall not have been fulfilled by the Termination Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(d)     By either Sellers or Buyer if there shall be a final non-appealable Order of any nature which is in effect and has the effect of making the Contemplated Transactions illegal, otherwise restraining or prohibiting consummation of the Contemplated Transactions or causing any of the Contemplated Transactions to be rescinded following completion thereof.

9.3     Effect of Termination.

(a)     Upon the termination of this Agreement in accordance with Section 9.2 hereof, and except as set forth in this Section 9.3, the Parties shall be relieved of any further obligations or liability under this Agreement.

(b)     Upon any termination pursuant to Sections 9.2(b)(i) or 9.2(b)(ii)(B), Sellers shall be entitled to retain the Cash Deposit as their sole remedy and as liquidated damages for expenses incurred in connection with this Agreement.

(c)     Upon any termination pursuant to Sections 9.2(a), 9.2(b)(ii)(A), 9.2(c) or 9.2(d), Sellers shall return the Cash Deposit to Buyer within three (3) days of such termination by wire transfer of immediately available funds.

(d)     Notwithstanding anything to the contrary contained herein, the provisions of this Section 9.3, Section 7.4 and Article XI shall survive any termination of this Agreement.

## Article X
## Tax Matters

10.1     Filing of Returns.  In connection with the preparation and filing of Tax Returns as of and after the Closing Date, Buyer and Sellers shall cooperate and exchange information as reasonably required to accomplish the matters contemplated by this Article X.

10.2     Transaction Taxes.  Buyer shall bear and be responsible for paying any sales, use, stamp, transfer, documentary, registration, business and occupation and other similar taxes (including related penalties (civil or criminal), additions to Tax and interest) imposed by any Governmental Authority with respect to the transfer of the Purchased Assets to Buyer ("***Transaction Taxes***"), regardless of whether any Tax authority seeks to collect such taxes from Sellers or Buyer.  Buyer shall also be responsible for (i) administering the timely payment of such Transaction Taxes directly to the correct Tax authorities, (ii) defending or pursuing any proceedings related thereto, and (iii) paying any expenses related thereto.  Sellers shall give prompt written notice to Buyer of any proposed adjustment or assessment of any Transaction Taxes with respect to the Contemplated Transactions.  In any proceedings, whether formal or informal, Sellers shall permit Buyer to participate and control the defense of such proceeding with respect to such Transaction Taxes, and shall take all actions and execute all documents required to allow such participation.

10.3   Tax Refunds.  Any Tax refunds (including any interest related thereto) received by Buyer, its Affiliates or successors relating to the Purchased Assets and to Tax periods or portions thereof ending on or before the Closing Date shall be for the account of Sellers, and Buyer shall pay over to Sellers any such amount within thirty (30) days of receipt thereof.

10.4   Tax Prorations.  As to any Purchased Assets acquired by Buyer, Sellers and Buyer shall apportion the liability for personal property taxes and ad valorem taxes ("*Periodic Taxes*") for all Tax periods including but not beginning or ending on the Closing Date (the "*Proration Periods*").  The Periodic Taxes described in this Section 10.4 shall be apportioned between Sellers and Buyer as of the Closing Date, with Buyer liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the numerator of which is the number of days remaining in the Proration Period including and after the Closing Date, and the denominator of which is the total number of days covered by such Proration Period.  Sellers shall be liable for that portion of the Periodic Taxes for the Proration Period for which Buyer is not liable under the preceding sentence.  Buyer and Sellers shall pay or be reimbursed for personal property taxes (including instances in which such property taxes have been paid before the Closing Date) on this prorated basis.  Each Party shall make any payments due to another Party under this Section 10.4 by wire transfer of immediately available funds within thirty (30) days of receiving notice of such obligation.  The Party responsible for paying a Tax described in this Section 10.4 shall be responsible for administering the payment of (and any reimbursement for) such Tax.  For purposes of this Section 10.4, the Proration Period for ad valorem taxes and real and personal property taxes shall be the fiscal period for which such taxes were assessed by the relevant Tax authority.

## Article XI
## General Provisions

11.1   Bankruptcy Court Approval.  This Agreement and the transaction contemplated hereby are contingent upon the approval and authorization of the Bankruptcy Court.

11.2   Notices.  All notices and other communications required or permitted under this Agreement shall be in writing, and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) when received by the addressee if sent by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 11.2):

(a)   If to Buyer, to:

Platform Universe, LLC
c/o Cheryl L. Huseman
6700 Woodlands Parkway, Suite 230-214
The Wodlands, Texas 77382

E-mail: cherielh@gmail.com

With a copy to, which shall not constitute notice to Buyer, to:

STRASBURGER & PRICE, LLP
720 Brazos Street, Suite 700
Austin, Texas 78701
Attn: Duane Brescia
Fax: (512) 536-5709
E-mail: Duane.Brescia@strasburger.com

(b)    If to Sellers, to:

Dan Bensimon, CRO
On behalf of BullionDirect, Inc.
UNIQUE STRATEGIES GROUP, INC.
7028 Cielo Azul Pass
Austin, Texas 78732
Email: dbensimon@austin.rr.com

With a copy to, which shall not constitute notice to Sellers, to:

Joseph D. Martinec
MARTINEC, WINN, VICKERS & MCELROY, P.C.
919 Congress Avenue, Suite 200
Austin, Texas 78701
Email: martinec@mwvmlaw.com

11.3   Survival of Representations and Warranties. All representations and warranties made by Sellers in Article V of this Agreement shall terminate on the Closing Date upon the purchase of the Purchased Assets by Buyer, and neither Sellers nor their respective Affiliates shall have any liability after the Closing Date for any breach of any representation or warranty of Article V of this Agreement. All provisions of Sections 7.5, 7.8, 7.9, 7.10, 7.11 and 7.12 shall survive the Closing Date.

11.4   Binding Effect and Third-Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee, responsible Person, estate administrator, post-confirmation Trust or Trustee, representative or similar Person appointed for or in connection with the Chapter 11 Case or in any subsequent case under the Bankruptcy Code in which BDI is a debtor. The Parties acknowledge and agree that Huseman and Murph are intended third-party beneficiaries of Sections 7.10 and 7.111. Except as otherwise provided in this Agreement, nothing in this Agreement is intended or shall be construed to confer on any Person other than the Parties any rights or benefits hereunder.

11.5 <u>Headings</u>. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

11.6 <u>Exhibits and Schedules</u>. The Exhibits and Schedules referred to in this Agreement are hereby incorporated and shall be deemed to be an integral part of this Agreement.

11.7 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document.

11.8 <u>Governing Law</u>. Except to the extent inconsistent with the Bankruptcy Code (in which case the Bankruptcy Code shall govern), this Agreement shall be governed by and construed under Texas law, without regard to conflict of laws principles. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the Parties in the Bankruptcy Court, or, if the Bankruptcy Court does not have jurisdiction, in the courts of the State of Texas, County of Travis, or, if it has or can acquire jurisdiction, in the United States District Court for the Western District of Texas, and all of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere it the world.

11.9 <u>Waivers</u>. Compliance with the provision of this Agreement may be waived only by a written instrument specifically referring to this Agreement and signed by the party waiving compliance. No course of dealing, nor any failure or delay in exercising any right, shall be construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

11.10 <u>Pronouns</u>. The use of a particular pronoun herein shall not be restrictive as to gender or number but shall be interpreted in all cases as the context may require.

11.11 <u>Modification</u>. No supplement, modification or amendment of this Agreement shall be binding unless made in a written instrument which is signed by all of the Parties and which specifically refers to this Agreement.

11.12 <u>Assignment</u>. After Closing, any Party may assign this Agreement or any right or obligation hereunder to a third-party Person without obtaining the consent of any other Party.

11.13 <u>Entire Agreement</u>. This Agreement and the agreements and documents referred to in this Agreement or delivered hereunder are the exclusive statement of the agreement among the Parties concerning the subject matter hereof and as expressed in the asset purchase agreement portion of the Term Sheet. All negotiations among the Parties are merged into this Agreement, and there are no representations, warranties, covenants, understandings or agreements, oral or otherwise, in relation thereto among the Parties other than those incorporated herein and to be delivered hereunder. All remaining portions of the Term Sheet shall survive.

11.14 <u>Severability</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, the legality, validity,

and enforceability of the remaining provisions of this Agreement shall not be affected thereby, and in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be legal, valid, and enforceable.

INTENDING TO BE LEGALLY BOUND, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Platform Universe, LLC

By: _Cheryl L. Huseman_

     Cheryl L. Huseman, Manager

**HUSEMAN AND MURPH INDIVIDUALLY SOLELY AS TO THEIR INDIVIDUAL OBLIGATIONS IN § 4.4, 4.5(f) and 7.8:**

_Cheryl L. Huseman_

Cheryl L. Huseman

_C. Jack Murph_

C. Jack Murph

**SELLERS:**

Bullion Direct, Inc.

By: _____

    Dan Bensimon, Chief Restructuring Officer

Nucleo Development Company, LLC

By: Bullion Direct, Inc. – Sole Member-Manager

    By: _____

      Dan Bensimon, Chief Restructuring Officer

1797009.2/SPA/40278/0101/052316

# EXHIBIT A

## Purchased Assets

**Patents:**
US 7,584,135 Assigned to Bullion Direct, Inc. Reel/Frame 11827-481 issued September 1, 2009.

**Trademarks:**
All registered and common law trademarks including but not limited to:
Trademarks registered in the U.S. Patent and Trademark Office
- BullionDirect® (Reg. No. 3453844)(Serial No. 78942339)
- NucleoExchange® (Reg. No. 3991537)(Serial No. 77822673)
- Nucleo® (Reg. No. 3991536)(Serial No. 7782264)

Trademarks registered in Canadian Intellectual Property Office
- BullionDirect (Reg. No. TMA791586)(Serial No.1452354)

Common Law trademarks which have been used in commerce by Bullion Direct, Inc. and/or Nucleo Development Company, LLC, including:
- OrderMatch™
- NucleoCore™

**Domain names:**
The following domain names owned by Bullion Direct, Inc. or Nucleo Development Company LLC and hosted by GoDaddy.  The source below is from the web-site listing of Bullion Direct and Nucleoware accounts:
GoDaddy Account:  Nucleoware (46924394)

| Domains | Expires | Registration Type | |
|---|---|---|---|
| nucleocore.com | 6/6/2016 | Public | |
| nucleodevco.com | 7/18/2016 | Public | |
| nucleodevcompany.com | 7/18/2016 | Public | |
| nucleodevelopmentco.com | 7/18/2016 | Public | |
| nucleodevelopmentcompany.com | 7/18/2016 | Public | |
| nucleomarket.com | 7/18/2016 | Public | |
| nucleomarkets.com | 7/18/2016 | Public | |
| nucertification.com | 2/5/2017 | Public | |
| nucertify.com | 2/5/2017 | Public | |
| nucleoware.com | 3/23/2017 | PRIVATE | |
| nucleomatch.com | 9/6/2017 | Public | |

**GoDaddy Account: BullionDirect (25241572)**

| Domains | Expires | Registration Type | |
|---|---|---|---|
| bullion-trade.com | 11/13/2017 | PRIVATE | |
| bullionex.com | 11/13/2017 | PRIVATE | |
| bullionuniverse.com | 11/13/2017 | PRIVATE | |
| bullionusa.com | 11/13/2017 | PRIVATE | |
| ediversify.com | 11/13/2017 | Public | |

| Domains | Expires | Registration Type | |
|---------|---------|-------------------|---|
| numisdirect.com | 11/13/2017 | Public | |
| ordermatch.com | 11/14/2017 | PRIVATE | |
| bullion-trader.com | 12/27/2017 | PRIVATE | |
| bulliondirect.com | 6/5/2018 | PRIVATE | |

## Code and software:

All source codes and repository for the Bullion Direct and Nucleo platforms and any associated operations features. Includes, but is not limited to, code base plus current configuration of how software is set up (including product information).

- Bullion Direct — current operating source code and all previous iterations contained in the source code repository (Redmine) and all supporting ancillary software.
- Nucleo — whether owned by Nucleo or BDI, any previous or current software related to Nucleo platform in general.
- All documentation and data related to software platform including the established knowledge base.

## Remote Equipment and Hosting Facility

Servers hosted at zColo a wholly owned subsidiary of Zayo Group, operating colocation and data center services in Austin, TX, including but not limited to:

- Source code management
- Jenkins continuous integration
- Project Management
- Nexus repository for code artifacts

## Miscellaneous Equipment

Tamper evident packaging equipment including but not limited to:

- TP3 "Semi-Automatic Thermopress" and Air Compressor for Certicard(R)
- Systech "eFingerprint" printer, scanner, and laptop

## Contracts, Agreements, and Accounts

The option to obtain all assignable contracts between BDI or Nucleo and service providers/vendors such as shipping, vault, and banking vendors, if such agreements are necessary for start-up and continuation of the Newco business.

- Third party software and existing integration and configurations used by, or in operation of the platform (ie. LivePerson, IBM Analytics, Google, GoDaddy, security, etc.)

## The following assets from the bankruptcy trust estate list provided by Dan Bensimon:

| Cubesmart Storage 1019 | | |
|---|---|---|
| 2 | 40" TV's Flat Screen | |
| 3 | Dell Rack mount servers | |
| 4 | Dell Rack mount switches | |
| 3 | Power BackUp Supply | |
| 1 | Brandt Coin Counter | |
| 1 | Lot of Elfa wire shelves (Grey) | |

| 1 | | Mettler Scale | |
| 2 | | Bank Readers (Check 21) | |
| 1 | | Zebra Printer (small) | |
| 1 | | Polygon Conference Phone | |

| Offices 700 Lavaca | | | |
| | | | |
| Remote Equipment (hosting Facility, unpaid support staff) | | | |
| 1 | | Lot Misc Servers | |
| 4 | | Computers | |

## Miscellaneous Equipment

The following are BD assets stored at the vault location and will be necessary to provide third party vault and fulfillment services:

| BD Assets | |
| --- | --- |
| Rolling Cages | 3 |
| Static Shelves with bins | 3 |
| Bins | 99 |
| Static Shelves | 10 |
| Boxes of packing/shipping/storage supplies | 70 |
| Flat screen TV monitor (approx 50") | 2 |
| Heat sealer — foot activated | 2 |
| Heat sealer—table top | 2 |
| Loose boxes | 464 |
| Bundles of boxes | 6 |
| Certiline sealer | 1 |
| Certiline sealer boxes of supplies | 17 |
| Air compressors | 2 |
| Laptop * | 1 |
| Zebra printer* | 2 |
| Label maker* | 1 |
| Scales* | 5 |
| Strapping machine | 1 |
| Coin counter | 1 |

**These items are for the Certiline/Systech certification and packaging process.*

## Schedule 4.3
## **Allocation**

Allocation of $100,000 purchase to assets identified in Article 2.1:

(1) all intellectual property assets = 50%

(2) all other personal property assets – furniture, fixtures, hardware, computers, equipment, office products = 45%

(3) release = 5%

*subject to revision prior to Closing Date

EXHIBIT B

## RELEASE AGREEMENT

**THIS RELEASE AGREEMENT** (this "*Agreement*"), dated as of May 23, 2016 ("*Effective Date*"), is made by and among BullionDirect, Inc. ("*BDI*"), Nucleo Development Company, LLC ("*Nucleo Development*"), Cheryl L. Huseman ("*Huseman*") and C. Jack Murph ("*Murph*"). BDI, Nucleo Development, and their Subsidiaries and Affiliates, are herein referred to from time to time as "*Sellers*". BDI, Nucleo Development, Huseman and Murph are herein referred to from time to time as the "*Parties*" and each, individually, as a "*Party*".

## RECITALS

WHEREAS, the Sellers and Platform Universe, LLC have entered into that certain Asset Purchase Agreement dated effective as of May 23, 2016 (the "*Asset Purchase Agreement*"), under which Sellers will sell, assign, transfer and convey certain assets to Platform Universe, LLC; and

WHEREAS, for good and valuable consideration and as a condition to closing of the Asset Purchase Agreement, Sellers, and their Subsidiaries and Affiliates, have agreed to relinquish certain Claims as contemplated herein;

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby covenant and agree as follows:

## AGREEMENT

1. <u>Release by Sellers</u>. Effective as of the closing of the Asset Purchase Agreement, as defined therein (the "*Closing*"):

(a) Sellers, and their Subsidiaries and Affiliates, each do hereby finally, unconditionally, irrevocably, and absolutely release, acquit, remise, and forever discharge Huseman and Murph (each individually, a "*Releasee*" and, collectively, the "*Releasees*") from any and all causes of action, charges, claims, complaints, controversies, costs, counterclaims, damages, debts, demands, equitable proceedings, executions, expenses, legal proceedings, liabilities, losses, matters, objections, obligations, orders, proceedings, reckonings, remedies, rights, setoffs, suits, and sums of money, of any kind, whether any of the foregoing exist at common law, exist by statute, or otherwise, and whether known or unknown, whether matured or unmatured, whether absolute or contingent, whether direct or derivative, whether suspected or unsuspected, and whether liquidated or unliquidated (each, a "*Claim*," and collectively, the "*Claims*"), including, but not limited to, any claims for breach of contract, breach of any special relationship, breach of duty of care, breach of duty of loyalty, breach of fiduciary duty, concealment, conflicts of interest, conspiracy, control, course of conduct or dealing, debt recharacterization, deceit, deceptive trade practices, deepening insolvency, defamation, disclosure, duress, economic duress, equitable subordination, fraud, fraudulent conveyance, fraudulent transfer, gross negligence, insolvency law violations, interference with contractual and business relationships, misrepresentation, misuse of insider information, negligence, breach of obligation of fair dealing, breach of obligation of good faith and fair dealing, breach of obligation of good faith, preference, secrecy, securities and antitrust laws violations, substantive

1

consolidation, tying arrangements, unconscionability, usury, violations of statutes and regulations of governmental entities, instrumentalities and agencies, wrongful recoupment or setoff, or any tort, whether common law, statutory, or in equity, and including as a result of, or in relation to, any negligence of any Releasee.

(b)     Except as otherwise provided for herein, Sellers, and their Subsidiaries and Affiliates, each hereby irrevocably waives and covenants and agrees to forbear and refrain from, directly or indirectly, asserting any Claim, or commencing, instituting, or causing to be commenced or instituted, any legal, arbitral, or equitable proceeding of any kind (whether actual, asserted or prospective) against any Releasee based upon any matter released pursuant to this Agreement.

(c)     Without in any way limiting any of the rights and remedies otherwise available to any Releasee, Sellers, and their Subsidiaries and Affiliates, shall each, jointly and severally, indemnify and hold harmless each Releasee from and against all liabilities, claims, damages, and expenses (including reasonable attorneys' fees), whether or not involving third-party claims, arising directly or indirectly from or in connection with the assertion by or on behalf of Sellers of any Claim.

2.  Severability.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal,, or unenforceable in any respect in any jurisdiction under any applicable law, such invalidity, illegality, or unenforceability shall not affect the validity, legality, or enforceability of any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed, and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal, or unenforceable provision.

3.  Successors and Assigns; Third Party Beneficiaries.  The obligations of any Party under this Agreement may not be assigned without the prior written consent of the other Party, and any purported assignment in violation of the foregoing shall be void *ab initio*.  Subject to the immediately preceding sentence, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement is intended or shall be construed to confer upon any Person other than the Parties, the Releasees, and their respective successors and permitted assigns any right, remedy, or claim under or by reason of this Agreement.

4.  Representations, Warranties, and Covenants of Releasees.

(a) Releasees represent and warrant that the statements and information Releasees provided to counsel for BDI and counsel for the Official Committee of Unsecured Creditors of BDI dated March 21, 2016 is accurate and complete as of the dates identified in such disclosure.

(b) Releasees covenant that they will comply with their obligations under the Asset Purchase Agreement.

5.  Representations and Warranties of Sellers.

2

(a) BDI is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas. Nucleo Development is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas.

(b) All requisite action to approve, execute, deliver and perform this Agreement has been taken by Sellers. This Agreement has been duly executed and delivered by each Seller and constitute the binding obligation of such Seller, enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other laws affecting creditors' rights generally and by principles of equity.

(c) The execution, delivery, and performance of this Agreement by Sellers does not and will not (i) conflict with or violate their organizational documents or (ii) violate any applicable law.

6. Governing Law; Venue; Waiver of Jury Trial.

(a) This Agreement will be governed by, and construed in accordance with, the laws of the State of Texas, regardless of the laws that might otherwise govern under principles of conflict of laws thereof. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the Parties in the Bankruptcy Court, or, if the Bankruptcy Court does not have jurisdiction, in the courts of the State of Texas, County of Travis, or, if it has or can acquire jurisdiction, in the United States District Court for the Western District of Texas, and all of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere it the world.

(b) TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT, OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT AND THAT SUCH ACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

7. Specific Performance. Sellers acknowledge and agree that the Releasees would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, Sellers agree that each of the Releasees shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and

3

provisions hereof, without, except as may be required by law, the requirement of posting bond or other form of security, in any action instituted in any court of the United States or any state thereof having, in accordance with the terms of this Agreement, jurisdiction over Sellers and any of the Releasees, and the matter, in addition to any other remedy to which it may be entitled, at law or in equity.

8. Entire Agreement. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter herein, and supersedes all prior agreements, understandings, representations, or warranties, written or oral, with respect to the subject matter herein by or between the Parties.

9. Further Actions. Each Party shall execute and deliver such documents and take such other actions as may reasonably be requested by the other Party in order to carry out the provisions of this Agreement.

10. Knowing and Voluntary Waiver. Sellers, by their free and voluntary act of signing below, each (a) acknowledges that it has been given appropriate time to consider whether to agree to the terms contained herein, (b) acknowledges that it has been advised to consult with an attorney and has consulted with an attorney prior to executing this Release, (c) acknowledges that it understands that this Agreement specifically releases and waives rights and Claims that it may have, and (d) agrees to all of the terms of this Agreement and intends to be legally bound thereby. The Parties hereto acknowledge and agree that each Party has reviewed and negotiated the terms and provisions of this Agreement and has contributed to its preparation (with advice of counsel). Accordingly, the rule of construction to the effect that ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement. Rather, the terms of this Agreement shall be construed fairly as to all Parties and not in favor of or against any Party based on the fact that such Party may have drafted such terms or provisions.

11. Interpretation. The Recitals are incorporated into this Agreement for all purposes. This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by each of the Parties. Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter; (b) words using the singular or plural number also include the plural or singular number, respectively; and (c) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement. References to a Person are also to its successors and/or permitted assigns, if any. Unless specifically provided for herein, the term "or" shall not be deemed to be exclusive. The headings contained in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement. As used herein, "*Affiliate*" means, with respect to any, individual, corporation, partnership, joint venture, limited liability company, unincorporated organization, trust, association or other entity (a "*Person*"), any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise; and "*Subsidiary*" as to any Person, means any corporation, partnership, limited liability company, joint venture, trust or estate of or in which more than 50% of (a) the

4

issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether at the time capital stock of any other class of such corporation may have voting power upon the happening of a contingency), (b) the interest in the capital or profits of such partnership, limited liability company, or joint venture or (c) the beneficial interest in such trust or estate is at the time directly or indirectly owned or controlled through one or more intermediaries, or both, by such Person.

      12. <u>Counterparts</u>. This Agreement may be executed and delivered (including by facsimile or Portable Document Format (pdf) transmission) in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the Parties and delivered to the other Parties. Facsimile or pdf transmission of any signed original document or retransmission of any signed facsimile or pdf transmission shall be deemed the same as delivery of an original. At the request of any Party, the other Parties shall confirm facsimile or pdf transmission by signing a duplicate original document.

**[The remainder of this page is intentionally left blank.]**

1800049.1/SPA/40278/0101/052316

IN WITNESS WHEREOF, the undersigned have executed and delivered this Release Agreement as of the date first written above.

**SELLERS:**

BullionDirect, Inc.

By: _____
    ~~Dan Bensimon~~, Chief Restructuring Officer


NUCLEO DEVELOPMENT COMPANY, LLC

By:  ~~BullionDirect, Inc~~. – Sole ~~Member~~-Manager

    By: _____
        Dan Bensimon, ~~Chief Restructuring Officer~~

**HUSEMAN:**

_Cheryl L. Huseman_
_____
Cheryl L. Huseman

**MURPH:**

_____
C. Jack Murph

## DOMAIN NAME ASSIGNMENT

This Assignment is entered into and effective this 23 day of May, 2016 ("Effective Date") by and among **Platinum Universe LLC** ("Assignee"), a Texas limited liability company, **Bullion Direct, Inc.**, a Texas corporation and **Nucleo Development Company, LLC** (**Nucleo Development Company LLC**, together with **Bullion Direct, Inc.**, "Assignor"). **Bullion Direct, Inc.** is the debtor-in-possession in the Chapter 11 reorganization case, Case No. 15-10940-tmd pending in the United States Bankruptcy Court for the Western District of Texas, Austin Division. **Bullion Direct, Inc.** and **Nucleo Development Company, LLC** own certain domain names used in connection with its business;

**Platform Universe LLC**, a Texas limited liability company, having an address at 6700 Woodlands Pkwy, The Woodlands, Texas, is desirous of acquiring domain names in accordance with the Asset Purchase Agreement dated effective May 23, 2016 under Section 363 and 365 of the Bankruptcy Code;

NOW THEREFORE, in consideration of, among other things, the payment by Assignee of funds according to the Asset Purchase Agreement, the receipt and sufficiency of which is hereby acknowledged, Assignor assigns all rights, title and interest in and to the following:

As of the Effective Date, Assignors sell, transfer, convey, assign and deliver to Assignee all right title and interest of Assignors in and to the domain names and registrations set forth on Schedule II.

Assignors shall execute all further documents necessary to perfect Assignees title to and registration of the domain names.

This Assignment shall inure to the benefit of and is binding upon the successors and assigns of Assignors and Assignee. A proper officer duly authorized by **Bullion Direct, Inc**. and **Nucleo Development Company, LLC** has executed this assignment.

*[Signature page directly follows]*

IN WITNESS WHEREOF, the parties have executed this Assignment effective as of the Effective Date.

BULLIONDIRECT, INC.

By: _____
      Dan Bensimon, Chief Restructuring Officer

NUCLEO DEVELOPMENT COMPANY, LLC

By: BullionDirect, Inc. – Sole Member-Manager

      By: _____
          Dan Bensimon, Chief Restructuring Officer

Acknowledgement by Notary:

THE STATE OF TEXAS          §
                            §
COUNTY OF TRAVIS            §

This instrument was acknowledged before me on **May 31** 2016 by Dan Bensimon as Chief Restructuring Officer of BullionDirect, Inc., a Texas Corporation and Nucleo Development Company, LLC, a Texas limited liability company on behalf of said corporation and said company.



_____
Notary Public, State of Texas

[SEAL]

ROBERTA WHITE
Notary Public, State of Texas
My Commission Expires
November 22, 2017

## SCHEDULE II

### DOMAIN NAMES

**GoDaddy Account:  Nucleoware (46924394)**

| Domains | Expires | Registration Type | |
|---|---|---|---|
| nucleocore.com | 6/6/2016 | Public | |
| nucleodevco.com | 7/18/2016 | Public | |
| nucleodevcompany.com | 7/18/2016 | Public | |
| nucleodevelopmentco.com | 7/18/2016 | Public | |
| nucleodevelopmentcompany.com | 7/18/2016 | Public | |
| nucleomarket.com | 7/18/2016 | Public | |
| nucleomarkets.com | 7/18/2016 | Public | |
| nucertification.com | 2/5/2017 | Public | |
| nucertify.com | 2/5/2017 | Public | |
| nucleoware.com | 3/23/2017 | PRIVATE | |
| nucleomatch.com | 9/6/2017 | Public | |

**GoDaddy Account: BullionDirect (25241572)**

| Domains | Expires | Registration Type | |
|---|---|---|---|
| bullion-trade.com | 11/13/2017 | PRIVATE | |
| bullionex.com | 11/13/2017 | PRIVATE | |
| bullionuniverse.com | 11/13/2017 | PRIVATE | |
| bullionusa.com | 11/13/2017 | PRIVATE | |
| ediversify.com | 11/13/2017 | Public | |
| numisdirect.com | 11/13/2017 | Public | |
| ordermatch.com | 11/14/2017 | PRIVATE | |
| bullion-trader.com | 12/27/2017 | PRIVATE | |
| bulliondirect.com | 6/5/2018 | PRIVATE | |

## TRADE-MARK ASSIGNMENT

**WHEREAS**  Bullion Direct, Inc. a Texas corporation, (hereinafter called the "Assignor"), whose address is  700 Lavaca Street, Suite 1400, Austin, Texas 78701, is the owner of all right, title and interest in the trade-mark(s) and in the trade-mark registration(s):

### BULLION DIRECT Canadian Trade-Mark Serial No. 1452354
### Canadian Trade-Mark Registration No. TMA791586

**AND WHEREAS**    Platform Universe, LLC, a Texas limited liability company, (hereinafter called the "Assignee"), whose principal office or place of business is: 6700 Woodlands Pkwy, the Woodlands, TX, is desirous of securing all right, title and interest in said trade-mark(s), said registration, and the goodwill of the business symbolized by and associated with said trade-mark(s);

**NOW THEREFORE** the ASSIGNOR in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration to it paid by the ASSIGNEE, the receipt of which is hereby acknowledged, acknowledges that it has sold, assigned and transferred and does hereby sell, assign and transfer to the said Assignee all of its right, title and interest in Canada in and to the trade-mark(s), the application, and the goodwill of the business symbolized by and associated with said trade-mark(s).

**IN WITNESS WHEREOF** the Assignor hereto has hereunder executed this Assignment under the hand of a proper officer duly authorized on that behalf as of this 31st day of __May__ , 2016.

BULLIONDIRECT, INC.

By: _____

Dan Bensimon, Chief Restructuring Officer

Witness:

## ASSIGNMENT

**Bullion Direct, Inc.**, a corporation of the State of Texas having an address at 700 Lavaca Street, Suite 1400, Austin, Texas 78701, being Assignee of United States Letters Patent entitled **"System and Method for Electronic Trading and Delivery of a Commoditized Product"** granted in the United States Patent and Trademark Office on September 1, 2009, and having Patent No. 7,584,135 (the "Patent"); **Bullion Direct, Inc.** is the debtor-in-possession in the Chapter 11 reorganization case, Case No. 15-10940-tmd pending in the United States Bankruptcy Court for the Western District of Texas, Austin Division;

**Platform Universe LLC**, a Texas limited liability company, having an address at 6700 Woodlands Pkwy, The Woodlands, Texas, is desirous of acquiring an interest in the Patent as one of the assets purchased in accordance with the Asset Purchase Agreement dated effective May 23, 2016 under Section 363 and 365 of the Bankruptcy Code;

NOW, THEREFORE, for and in consideration of the payment by **Platform Universe LLC** of funds according to the Asset Purchase Agreement, the receipt and sufficiency of which is hereby acknowledged, **Bullion Direct, Inc.** by these presents do sell, assign and transfer unto **Platform Universe LLC**, the full, exclusive and entire right, title, and interest in and to the Patent, in and to any divisions, continuations, and reissues thereof, and in and to all inventions and improvements disclosed and described in the Patent; and does hereby request the Commissioner of Patents and Trademarks to issue any and all Letters Patent of the United States resulting from the Patent, or from a division, continuation, or reissue thereof, to **Platform Universe LLC**, as the assignee, for its interest and for the sole use and benefit of **Platform Universe LLC** and its assigns and legal representatives;

For the same consideration, **Bullion Direct, Inc.**, by these presents does sell, assign, and transfer to **Platform Universe LLC**, the full, exclusive, and entire right, title and interest in and to any foreign application or applications corresponding to the Patent, in whole or in part, in countries other than the United States, in and to any Letters Patent and similar protective rights granted on the foreign applications, and in and to the right to claim any applicable priority rights arising from or required for the foreign applications under the terms of any applicable conventions, treaties, statutes, or regulations; the foreign applications to be filed

- 1 -

and issued in the name of **Platform Universe LLC**, or its designee insofar as permitted by applicable law.

AND, for the same consideration, **Bullion Direct, Inc.** agrees to sign all lawful papers, execute all division, continuing, reissue and other applications, make all assignments and rightful oaths, and generally do everything possible to aid **Platform Universe LLC**, its successors, assigns, and nominees, to obtain and enforce proper protection for all the inventions and improvements in all countries throughout the world.

A proper officer duly authorized by **Bullion Direct, Inc.** has executed this assignment effective as of this 23rd day of _May_, 2016.

**Bullion Direct, Inc.**

By: _____

Dan Bensimon, Chief Restructuring Officer

Acknowledgement by Notary:

THE STATE OF TEXAS §
§
COUNTY OF Travis §

This instrument was acknowledged before me on May 31, 2016 by Dan Bensimon, Chief Restructuring Officer of Bullion Direct, Inc., a Texas corporation, on behalf of said corporation.



Notary Public, State of Texas

ROBERTA WHITE
Notary Public, State of Texas
My Commission Expires
November 22, 2017

- 2 -

1800056.1/SPA/40278/0101/052316

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Agreement*"), is by and among PLATFORM UNIVERSE, LLC, a Texas limited liability company ("*Buyer*"), BULLIONDIRECT, INC., a Texas Corporation ("*BDI*"), and NUCLEO DEVELOPMENT COMPANY, LLC, a Texas limited liability company ("*Nucleo Development*" and BDI each a "*Seller*" and, collectively, the "*Sellers*"). Buyer and Sellers may be referred to herein individually as a "*Party*" and collectively as the "*Parties*."

This Agreement is being delivered pursuant to that certain Asset Purchase Agreement, dated effective as of May 23, 2016, by and among Buyer and Sellers (the "*Purchase Agreement*"), pursuant to which (among other things) Sellers have agreed to sell, transfer, and assign to Buyer the assets and rights described in the Purchase Agreement as the "Purchased Assets," and Buyer has agreed to acquire and assume the same.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration stipulated in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows effective as of the Closing Date (the "*Effective Date*"):

1.    **Defined Terms.**  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Purchase Agreement.

2.    **Conveyance of Purchased Assets.**  Subject to and upon the terms and conditions of the Purchase Agreement, Sellers do hereby sell, transfer, convey, assign, and deliver to Buyer, free and clear of all Liens, and Buyer does hereby accept from Sellers all of Sellers' right, title, and interest in and to the Purchased Assets and each of them. For the avoidance of doubt, Sellers do not sell, transfer, convey, assign, or deliver and Buyer does not otherwise receive title to any of the Excluded Assets, and the Parties agree that all Excluded Assets shall remain the property of Sellers.

3.    **Assumption of Assumed Liabilities.**  Subject to and upon the terms and conditions of the Purchase Agreement, Sellers hereby assign to Buyer, and Buyer does hereby assume and agree to pay and discharge from and after the Closing Date, the Assumed Liabilities together with all of Sellers' rights, benefits, privileges, and interests related to such Assumed Liabilities.

4.    **Purchase Agreement Terms.**  This Agreement is subject to the terms and conditions of the Purchase Agreement. In the event of any conflict or inconsistency in the terms of this Agreement and the Purchase Agreement, the Purchase Agreement shall control in all cases.

5.    **Future Documents.**  Each Seller covenants and agrees to execute, acknowledge, and deliver to Buyer such further instruments of conveyance and transfer and take such other action as may be reasonably required to more effectively convey, transfer to, and vest in Buyer or its successors and assigns the Purchased Assets, and to put Buyer or its successors and assigns in possession of the Purchased Assets conveyed, assigned, and delivered hereunder or otherwise to carry out the intent and purposes of this Agreement.

1800080.1/SPA/40278/0101/052316

6. **Governing Law.**  This Agreement and the rights and obligations of the Parties hereunder shall be governed by and construed in accordance with the laws of the State of Texas without regard to rules concerning conflicts of laws.

7. **Miscellaneous.**  This Agreement may be amended or modified only by written instrument signed by each of the Parties. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.  No delay in the exercise of any right under this Agreement shall waive such right.  Any waiver, to be enforceable, must be in writing and signed by the Party from whom the waiver is sought.  This Agreement may be executed and delivered in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Signature page follows*]

IN WITNESS WHEREOF, this Agreement has been duly executed by the Parties hereto to be effective as of the Effective Date.

**BUYER:**

PLATFORM UNIVERSE, LLC

By: _Cheryl S. Huseman_____

     Cheryl L. Huseman, Manager

**SELLERS:**

BULLIONDIRECT, INC.

By: _____

     Dan Bensimon, Chief Restructuring Officer

NUCLEO DEVELOPMENT COMPANY, LLC

BY: BULLIONDIRECT, INC. – SOLE MEMBER MANAGER

     BY: _____

     DAN BENSIMON, CHIEF RESTRUCTURING OFFICER

Bill of Sale, Assignment and Assumption Agreement
Signature Page

## OFFICER'S CERTIFICATE OF SELLERS

The undersigned, as Chief Restructuring Officer of **BULLIONDIRECT, INC.**, a Texas corporation ("*BDI*") and **NUCLEO DEVELOPMENT COMPANY, LLC**, a Texas limited liability company ("*Nucleo Development*") (BDI and Nucleo Development, each a "*Seller*" and collectively, the "*Sellers*"), pursuant to the terms of that certain Asset Purchase Agreement dated effective as of May 23, 2016 (the "*Agreement*"), by and among Platform Universe, LLC, as Buyer, and Sellers, hereby certifies as follows:

1.      Each of the representations and warranties made in the Agreement by each Seller, severally and not jointly, are true and correct in all material respects, on and as of the Sale Date with the same force and effect as though such representations and warranties were made on the Closing Date.

2.      Sellers have performed and complied in all material respects with all of the covenants and agreements required by the Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

IN WITNESS WHEREOF, I have subscribed my name this 31ˢᵗ day of May, 2016.

_____
DAN BENSIMON, CHIEF RESTRUCTURING OFFICER OF
BULLIONDIRECT, INC.

_____
DAN BENSIMON, CHIEF RESTRUCTURING OFFICER OF BULLIONDIRECT, INC., SOLE MEMBER-MANAGER OF NUCLEO DEVELOPMENT COMPANY, LLC

## OFFICER'S CERTIFICATE OF BUYER

The undersigned, as Manager of **PLATFORM UNIVERSE, LLC**, a Texas limited liability company ("***Buyer***"), pursuant to the terms of that certain Asset Purchase Agreement dated effective as of May 23, 2016 ( the "***Agreement***"), by and among Buyer, BullionDirect, Inc. and Nucleo Development Company, LLC, as Sellers, hereby certifies as follows (capitalized terms used and not defined herein are used herein as defined in the Agreement):

1.     Each of the representations and warranties made in the Agreement by Buyer are true and correct in all material respects, on and as of the Sale Date with the same force and effect as though such representations and warranties were made on the Closing Date.

2.     Buyer has performed and complied in all material respects with all of the covenants and agreements required by the Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

IN WITNESS WHEREOF, I have subscribed my name this 23 day of May, 2016.


_Cheryl S. Huseman_
CHERYL E. HUSEMAN, MANAGER

## TRADEMARK ASSIGNMENT

This Assignment is entered into and effective this 23 day of May, 2016 ("Effective Date") between **Bullion Direct, Inc.**, a Texas corporation ("Assignor") and **Platinum Universe LLC** ("Assignee"), a Texas limited liability company.  **Bullion Direct, Inc.** is the debtor-in-possession in the Chapter 11 reorganization case, Case No. 15-10940-tmd pending in the United States Bankruptcy Court for the Western District of Texas, Austin Division and owns certain trademarks used in connection with its business;

**Platform Universe LLC**, a Texas limited liability company, having an address at 6700 Woodlands Pkwy, The Woodlands, Texas, is desirous of acquiring the trademarks in accordance with the Asset Purchase Agreement dated effective May 23, 2016 under Section 363 and 365 of the Bankruptcy Code;

NOW THEREFORE, in consideration of, among other things, the payment by Assignee of funds according to the Asset Purchase Agreement, the receipt and sufficiency of which is hereby acknowledged, Assignor sells, transfers, conveys, assigns and delivers to Assignee all right title and interest of Assignor in and to (i) the trademarks set forth on Schedule I, (ii) the registrations and applications for registrations thereof and (iii) all related common law rights together with the goodwill of the business connected with the use and symbolized by such trademarks.

Assignor shall execute all further documents necessary to perfect Assignees title to the trademarks.

This Assignment shall inure to the benefit of and is binding upon the successors and assigns of Assignor and Assignee.

A proper officer duly authorized by **Bullion Direct, Inc**. has executed this assignment.

**Bullion Direct, Inc.**

By: _____

Dan Bensimon, Chief Restructuring Officer

Acknowledgement by Notary:

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

This instrument was acknowledged before me on **May 31**, 2016 by Dan Bensimon, Chief Restructuring Officer of BullionDirect, Inc., a Texas corporation, on behalf of said corporation.



_____

Notary Public, State of Texas

[SEAL]

**ROBERTA WHITE**
Notary Public, State of Texas
My Commission Expires
**November 22, 2017**

1800057.1/SPA/40278/0101/052316

# SCHEDULE I

## TRADEMARKS

**Registered United States Trademarks**

| TRADEMARK | SERIAL NUMBER | REGISTRATION NUMBER |
|---|---|---|
| BULLIONDIRECT | 78942339 | 3453844 |
| NUCLEOEXCHANGE | 77822673 | 3991537 |
| NUCLEO | 77822644 | 3991536 |

**Registered Canadian Trademark**

**BULLION DIRECT** Canadian trademark serial number 1452354, registration number TMA791586

**Common Law Trademarks**

OrderMatch™
NucleoCore™