# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| IN RE: § <br> § <br> **BULLIONDIRECT, INC.** § <br> a/k/a BD, BDI AND B DIRECT, INC., § <br> § <br> DEBTOR. § <br> § | CHAPTER 11 <br><br> CASE NO. 15-10940-tmd |

**MOTION UNDER BANKRUPTCY RULE 9019 TO APPROVE A SETTLEMENT AGREEMENT BETWEEN THE LITIGATION TRUST AND DILLON GAGE**

> **This pleading requests relief that may be adverse to your interests.**
>
> **If no timely response is filed within 21 days from the date of service, the relief requested herein may be granted without a hearing being held.**
>
> **A timely filed response is necessary for a hearing to be held.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Gregory S. Milligan, as trustee (the "Trustee") of the BullionDirect, Inc. Litigation Trust (the "Trust") under the confirmed chapter 11 plan of BullionDirect, Inc. ("BDI" or the "Debtor"), hereby files this *Motion Under Bankruptcy Rule 9019 to Approve a Settlement Agreement Between the Litigation Trust and Dillon Gage* (the "Motion") seeking approval of the settlement agreement attached hereto as **Exhibit 1** (the "Settlement Agreement") with Dillon Gage, Incorporated of Dallas and Diamond State Depository, LLC d/b/a International Depository Services of Delaware (collectively, "Dillon Gage").[1] In support of this Motion and the Settlement Agreement, the Trustee respectfully represent as follows:

---

[1] Unless otherwise defined herein, all capitalized terms used in the Motion shall have the meaning ascribed to them in the Settlement Agreement.

1

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Motions to approve settlements of estate causes of action and related controversies are core proceedings pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory authority for the relief requested herein is §§ 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II. BACKGROUND

### A. General Overview

2. This bankruptcy case was filed on July 20, 2015 (the "Petition Date"). On July 26, 2016, the Bankruptcy Court entered in the Bankruptcy Case an *Order Confirming the Debtor's Chapter 11 Plan of Reorganization*, Docket No. 209, confirming a chapter 11 plan (the "Plan"). The Debtor managed its estate as debtor-in-possession from the Petition Date until the appointment of the Trustee pursuant to the Plan.

3. At the time of the bankruptcy filing, BDI's balance sheet was shocking—its records reflect amounts owed to depository customers of almost $25 million, yet BDI had assets on hand worth less than $1 million. Without exception, the depository customer creditors of BDI have expressed surprise, disappointment, and anger that the assets they believed BDI was storing on their behalf were not in fact in BDI's possession. Many customers had entrusted BDI with storage of tens or hundreds of thousands of dollars of precious metals. For too many of these customers, these funds were a significant portion of their personal life savings. Many people's lives have been severely negatively impacted by the conduct of BDI towards its creditors.

4. During the course of the Bankruptcy Case, the operating assets of BDI were marketed for sale. The only serious interest generated during the marketing process came from

Platform Universe, LLC ("Platform Universe"), which acquired the operating assets of BDI in exchange for upfront cash plus a promise to split profits with the Trust. *See* Notice of Filing of Asset Purchase Agreement, filed May 6, 2016, Docket No. 167.

5. The Plan was subsequently confirmed, which transferred the remaining assets of BDI, including claims and causes of action, from BDI's bankruptcy estate to the Trust.

**B. Trustee's Investigation**

6. To investigate these causes of action and potential sources of recoveries, the Trustee has engaged the undersigned counsel along with John W. Thomas, a very experienced and well-respected Austin trial lawyer. Along with reviewing the books and records of BDI itself, the Trustee and his team have obtained document production from third-parties such as the Debtor's business partners, lawyers, and accountants. Both informal interviews and depositions under oath pursuant to Bankruptcy Rule 2004 have been conducted, including depositions of Dillon Gage representatives.

7. Among the causes of action transferred to the Trust under the Plan are avoidance actions against Dillon Gage. The Trustee entered a tolling agreement with Dillon Gage preserving these claims for future prosecution if needed.[2]

8. BDI initially used Dillon Gage as its principal wholesale supplier of precious metals. BDI would also sell precious metals to Dillon Gage. In 2015, a few months before the Petition Date, a Dillon Gage affiliate also began providing vaulting and customer order fulfillment and shipping services to BDI.

---

[2] The Trustee has also conducted searches for assets of certain former insiders of the Debtor, which have not revealed valuable property. The Trustee has entered tolling agreements with certain of these insiders that preserve the Trustee's rights to seek recovery from such insiders should assets of value be discovered.

3

9. Based on the Trustee's analysis, the Debtor transferred at least $775,000.00 to Dillon Gage during the preference period, which is the 90-days preceding the Petition Date for an apparent non-insider such as Dillon Gage. *See* 11 U.S.C. § 547(b)(4)(A). Dillon Gage has denied liability for any such pre-petition payments and has raised colorable defenses and affirmative defenses, including without limitation the ordinary course, security interest/offset, and subsequent new value defenses. *See* 11 U.S.C. §§ 547(b)(5), 547(c)(2), & 547 (c)(4).

10. The Trustee believes there are other colorable avoidance actions against Dillon Gage, all of which Dillon Gage denies. Further, Dillon Gage has raised colorable affirmative defenses to such avoidance actions—for instance, Dillon Gage argues that it provided value to BDI and acted in good faith. *See* 11 U.S.C. § 548(c). Some evidence does support these affirmative defenses—Dillon Gage did appear to provide value to BDI in the form of precious metals, and Dillon Gage representatives have consistently testified under oath that Dillon Gage believed that BDI was an ordinary retailer of precious metals and was unaware that BDI offering purported "depository" services as well. Moreover, Dillon Gage argues that it would have had very little economic incentive to continue doing business with BDI if Dillon Gage had known about BDI's treatment of its customer and their supposed deposits.

**C.  Dillon Gage Settlement Agreement**

11. The Trustee believes it is in the interest of the estate and the Trust beneficiaries to resolve these disputes with Dillon Gage as set forth in the Settlement Agreement. The Settlement Agreement is the product of true arms' length negotiations. The Trustee has had a number of negotiation sessions with Dillon Gage and various other offers were exchanged prior to reaching the Settlement Agreement over the course of several months.

12. The Settlement Agreement provides direct cash compensation of $324,500 to the Trust, which would almost double the current cash balance of the Trust. The Settlement Agreement also obligates Dillon Gage to provide support to Platform Universe, LLC, which acquired operating assets of BDI in exchange for, among other things, a promise to split profits with the Trust. *See* Notice of Filing of Asset Purchase Agreement, filed May 6, 2016, Docket No. 167.

13. Under the Settlement Agreement, Dillon Gage can recover the $324,500 settlement payment on a 50/50 basis with the Trust if and when the Trust receives profits from Platform Universe. This both ensures that the Trust will retain at least $324,500 in value from the Settlement Agreement and provides Dillon Gage with independent incentive to work with Platform Universe in good faith to bring Platform Universe to profitability.

14. As discussed below, settlement and release of the dispute with Dillon Gage will provide a meaningful recovery for the Trust without incurring substantial legal expense and protracted, expensive, and risky litigation. The Settlement Agreement is therefore in the best interests of the BDI creditors and the Trust and should be approved.

### III. ARGUMENTS AND AUTHORITY

15. If Court approval is appropriate,[3] the Trustee asks that the Court approve the Settlement Agreement. Bankruptcy settlements "are a normal part of the process of

---

[3] Under the terms of the Plan and applicable law, Court approval for settlements of the causes of action transferred to the Trust is not required. The provision of the Bankruptcy Code requiring bankruptcy court approval for non-ordinary settlements or other uses of estate property only apply to causes of action that are property of the bankruptcy estate. *See* 11 U.S.C. § 363(b). These causes of action are no longer "property of the estate" since they have been transferred to the Trust. *See* Plan, art. X. Further, the Trust Agreement that was approved by the Court after notice to creditors as part of the Plan confirmation provides "[t]he Trustee shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, compromise, or otherwise any and all Preserved Causes of Action assigned to the Trust." *See* Trust Agreement at § 2(g)(ii), Docket No. 193, filed June 30, 2016. Nevertheless, the Court retains jurisdiction to approve settlements. *See* Order Confirming the Debtor's Chapter 11 Plan of Reorganization at art. IX(g), Docket No. 209, entered July 26, 2016.

reorganization" and are "desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.),* 624 F.2d 599, 602 (5th Cir. 1980) (quoting *Case v. Los Angeles Lumber Prods. Co.,* 308 U.S. 106, 130 (1939)).

16. Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." *See* Fed. R. Bankr. P. 9019(a). The rule is silent, however, with respect to the standards to be applied when considering approval of such settlements or compromises. Here are some of the factors identified by the Fifth Circuit in determining whether approval is warranted:

   (a) the probability of success in litigation, with due consideration for the uncertainty in fact and law;

   (b) the complexity and likely duration of litigation and any attendant expenses, inconvenience and delay; and

   (c) the extent to which the settlement is truly the product of arms' length bargaining and not the product of fraud or collusion.

*See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. Inc. (In re Cajun Elec. Power Coop. Inc.),* 119 F.3d 349, 356 (5th Cir. 1997). A settlement need not result in the best possible outcome for a debtor, but must not "fall beneath the lowest point in the range of reasonableness." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

17. In deciding whether to approve a settlement, a bankruptcy court does not conduct a mini-trial on the merits or engage in an independent investigation into the reasonableness of the proposed settlement, but instead "relies heavily on the trustee" and the court generally defers to the trustee's judgment provided there is "a legitimate business justification" for the settlement. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir 1996). Basic to the process of

evaluating proposed settlements, then, is "the need to compare the terms of the compromise with the likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 425 (1968).

18. The Settlement Agreement should be approved under these factors. As discussed above, it is the product of several months of extensive arms'-length bargaining.

19. Moreover, litigation rather than settlement would be expensive and risky. The Trustee and Dillon Gage each believe in the merits of their own respective position. Thus, if the Settlement Agreement is not approved, there will most certainly be lengthy and protracted litigation, costing all parties time and litigation costs.

20. The Trust has very limited resources from which to fund litigation, which also weighs in favor of settlement. The Trust may not be able to find competent counsel willing to take this litigation up on contingency, requiring potentially more expensive hourly fee counsel. Expert witnesses and further discovery, including document production by the Trust, could also be required in litigation. This litigation could last for years before any potential recovery is obtained.

21. Further, there is no certainty of success. Recent litigation involving Dillon Gage itself shows how the Trust could spend hundreds of thousands of dollars in attorneys' fees and achieve no recovery. *See Janvey v. Dillon Gage, Inc.*, 856 F.3d 377 (5th Cir. 2017) (affirming jury verdict finding that transfers made by an entity related to the Stanford Ponzi scheme to Dillon Gage for purchases of precious metals were not made with fraudulent intent and therefore finding Dillon Gage free of fraudulent transfer liability).

22. Asserting fraudulent transfer claims against Dillon Gage could be difficult. Even if the Trustee establishes that the payments by the Debtor to Dillon Gage for precious metals

were made with fraudulent intent by the Debtor, which has been made more difficult by recent case law,[4] it could be difficult to convince a trier of fact that Dillon Gage did not provide "value" to BDI. And, as discussed above, Dillon Gage has produced evidence indicating that it acted in good faith and was unaware of the Debtor's unfunded obligations to depositors. These assertions, if accepted by a judge or jury, provide Dillon Gage with considerable insulation from fraudulent transfer liability. *See, e.g.,* 11 U.S.C. § 548(c) (protecting a transferee who provides value in good-faith from liability for intentional fraudulent transfers); *id.* § 548(b)(2) (requiring "less than reasonably equivalent value" for constructive fraudulent transfers).

23. Finally, settling the preference claims against Dillon Gage for almost half of the $775,000 apparently transferred during the preference period is a good deal for the Trust. Some evidence does support the arguments and defenses raised by Dillon Gage:

- Dillon Gage has produced some evidence that the payments within the preference period may be in the ordinary course of business when compared to the overall payment history between BDI and Dillon Gage and when compared to ordinary business terms, 11 U.S.C. § 547(c)(2);

- Dillon Gage asserts that it is a net creditor of BDI due to precious metals provided to BDI that BDI did not pay for, which indicates subsequent new value was provided after the transfers, *id.* at § 547(c)(4); and

- Dillon Gage asserts that it was generally secured by advanced payments/deposits from BDI, which if true means that the Trustee cannot show that the transfers provided Dillon Gage with more than it would receive in chapter 7, *id.* at § 547(b)(5).

24. On the other hand, the Settlement Agreement does provide considerable value to the Trust. The Settlement Agreement is guaranteed to increase the Trust's cash-on-hand by $324,500, which almost doubles the Trust' cash-on- hand. Further, the Settlement Agreement should increase the Trust's chance of achieving further recoveries through profit-sharing with Platform Universe, LLC, given the support of a market maker such as Dillon Gage.

---

[4] *See, e.g., Janvey v. Golf Channel, Inc.*, 834 F.3d 570, 572 (5th Cir. 2016).

## IV. P<small>RAYER</small>

WHEREFORE, the Trustee respectfully request that the Court enter an order in substantially the same form as the proposed order submitted with this Motion approving the Settlement Agreement and granting such other and further relief as this Court deems just and proper under the circumstances.

Respectfully submitted,

/s/ Jesse T. Moore
Jesse T. Moore
State Bar No. 24056001
Dykema Cox Smith
111 Congress Ave., Suite 1800
Austin, Texas 78701
Phone: 512-703-6325
Fax: 512-703-6399
Email: jmoore@dykema.com

**Counsel to Gregory S. Milligan, Trustee for the BullionDirect, Inc. Litigation Trust**

## Certificate of Service

I hereby certify that I served a copy of this Motion on October 25, 2017 via the Court's electronic case filing system to all parties receiving notice through such system, as listed below, and as permitted by the *Order Granting Second Amended* Ex Parte *Motion to Limit Notice by Gregory S. Milligan, Trustee for the BullionDirect, Inc. Litigation Trust*, which was entered on October 17, 2017, Docket No. 275.

*/s/ Jesse T. Moore*
Jesse T. Moore

Steven B. Bass on behalf of Creditor United States of America
Steven.Bass@usdoj.gov, lori.wilson@usdoj.gov

Duane J. Brescia on behalf of Interested Party C. Jack Murph
duane.brescia@strasburger.com, donna.krupa@strasburger.com;Kathryn.Alexander@strasburger.com;bkrtcynotices@strasburger.com

Duane J. Brescia on behalf of Interested Party Cheryl L. Huseman
duane.brescia@strasburger.com, donna.krupa@strasburger.com;Kathryn.Alexander@strasburger.com;bkrtcynotices@strasburger.com

Kay D. Brock on behalf of Creditor Travis County
bkecf@traviscountytx.gov, kay.brock@traviscountytx.gov

Richard T. Chapman on behalf of Creditor Janak Law Firm
rchapman@andersonsmith.com, roxanne@andersonsmith.com; Jamie@andersonsmith.com

Richard T. Chapman on behalf of Creditor Julius De Roma
rchapman@andersonsmith.com, roxanne@andersonsmith.com;Jamie@andersonsmith.com

Richard T. Chapman on behalf of Creditor Linda Strande
rchapman@andersonsmith.com, roxanne@andersonsmith.com; Jamie@andersonsmith.com

Brent A. Devere on behalf of Creditor David Ray
bdevere512@aol.com

Kirstin K Dutcher on behalf of Creditor Chris Smelick
kkd@lawsonlaski.com, heo@lawsonlaski.com

Kirstin K Dutcher on behalf of Creditor Robert Smelick
kkd@lawsonlaski.com, heo@lawsonlaski.com

Jeffrey R. Erler on behalf of Creditor Diamond State Depository, LLC
jeff.erler@cottonteam.com, Melissa.harrocks@cottonteam.com

Jeffrey R. Erler on behalf of Creditor Dillon Gage Inc. of Dallas
jeff.erler@cottonteam.com, Melissa.harrocks@cottonteam.com

Lisa C. Fancher on behalf of Creditor Kirk Davis Mahon
lfancher@fbhg.law

Laura Marie Fontaine on behalf of Creditor Diamond State Depository, LLC
Laura@HedrickKring.com, Mckenzie@HedrickKring.com;Lori@HedrickKring.com;Britt@HedrickKring.com

Laura Marie Fontaine on behalf of Creditor Dillon Gage Inc. of Dallas
Laura@HedrickKring.com, Mckenzie@HedrickKring.com; Lori@HedrickKring.com; Britt@HedrickKring.com

James V. Hoeffner on behalf of Creditor Louis S McCann
jhoeffner@gdhm.com, bcumings@gdhm.com

Joseph D. Martinec on behalf of Debtor BullionDirect, Inc.
martinec@mwvmlaw.com, white@mwvmlaw.com

Jesse Tyner Moore on behalf of Creditor Official Committee of Unsecured Creditors of BullionDirect, Inc.
jmoore@dykema.com

Jesse Tyner Moore on behalf of Trustee Gregory S. Milligan, Trustee of the BullionDirect, Inc. Litigation Trust
jmoore@dykema.com

William T. Peckham on behalf of Creditor Clinton C. Price
wpeckham@peckhamlawaustin.com, calexander@peckhamlawaustin.com

Michael J. Pledger on behalf of Creditor Christopher Lombardo
pledgerlaw@aol.com

Douglas J. Powell on behalf of Creditor David Emery
notices@swbell.net, dpowell@dougpowelllaw.com;ayana@dougpowelllaw.com

Peter C. Ruggero on behalf of Creditor Kazu Suzuki
peter@ruggerolaw.com

Stephen Matthew Schultz on behalf of Creditor Peter Lettang
stephen@tslf.com

Martin Warren Seidler on behalf of Creditor Gerard Barrack
marty@seidlerlaw.com, ecfseidlerlaw1@yahoo.com

United States Trustee - AU12
ustpregion07.au.ecf@usdoj.gov