# RELEASE AGREEMENT

**THIS RELEASE AGREEMENT** (this "Agreement") is made by and among:

(a) Gregory S. Milligan, Trustee (the "Trustee") for the BullionDirect, Inc. Litigation Trust and its successors and assigns (collectively, the "BDI Trust"); and

(b) Dillon Gage, Incorporated of Dallas and Diamond State Depository, LLC d/b/a International Depository Services of Delaware, for themselves and their successors, assigns, transferees, parents, subsidiaries, and affiliates (collectively, "Dillon Gage," and collectively with the Trust, the "Parties").

## RECITALS

WHEREAS, on July 20, 2015, BullionDirect, Inc. ("BDI") commenced a bankruptcy proceeding, No. 15-10940-TMD (the "Bankruptcy Case") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas (the "Bankruptcy Court");

WHEREAS, on July 26, 2016, the Bankruptcy Court entered in the Bankruptcy Case an *Order Confirming the Debtor's Chapter 11 Plan of Reorganization*, Docket No. 209, confirming a chapter 11 plan (the "Plan") that, among other things, transferred various claims and causes of action from BDI's bankruptcy estate to the Trust;

WHEREAS, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in reliance on the representations, covenants, and warranties provided below, the Parties have agreed to relinquish certain Claims as contemplated in this Agreement and hereby covenant and agree as follows:

## AGREEMENT

1. Bankruptcy Court Review. Within five (5) business days of the execution of this Agreement, the Trustee shall file a motion with the Bankruptcy Court in the Bankruptcy Case asking the Bankruptcy Court to enter an order either approving this Settlement Agreement or finding that such approval is not needed under Bankruptcy Code and the terms of the Plan. The Settlement Agreement will be effective on the first day (the "Effective Date") that is fourteen (14) calendar days after the Bankruptcy Court has entered such order and such order is not stayed under its own terms or any other order of the Court or of another court of competent jurisdiction. Nothing in this Agreement is binding or effective prior to the Effective Date other than the Trustee's obligation to file the above-mentioned motion.

2. Settlement Consideration.

   (a) Within five (5) business days of Effective Date, Dillon Gage shall transmit the Trustee the amount of $324,500 (the "Settlement Payment") by wire or other means pursuant to the Trustee's written instructions.

(b) Dillon Gage agrees and promises to the Trustee on behalf of the Trust that the Trust or its assignee may enforce the rights of Platform Universe LLC as set forth in the *Letter of Intent* attached hereto as **Exhibit A** (the "Bullion Universe LOI") and as set forth in any other agreements between Platform Universe LLC and Dillon Gage.

(c) The Trustee shall thereafter pay to Dillon Gage fifty percent (50%) of all "Contingent Payments," as defined by the *Asset Purchase Agreement* attached as an exhibit to the *Notice of Filing of Asset Purchase Agreement* filed in the Bankruptcy Case on May 6, 2016, Docket No. 167, received by the Trust within five (5) business days of receiving any such Contingent Payments until Dillon Gage has received aggregate payments from the Trust of $162,250.

3. Mutual Release. Upon the (x) execution of this Agreement by all Parties, (y) the occurrence of the Effective Date, and (z) the BDI Trust receiving the Settlement Payment:

(a) Except as otherwise provided for herein, each Party does hereby finally, unconditionally, irrevocably, and absolutely release, acquit, remise, and forever discharge the other Party from any and all causes of action, charges, claims, complaints, controversies, costs, counterclaims, damages, debts, demands, equitable proceedings, executions, expenses, legal proceedings, liabilities, losses, matters, objections, obligations, orders, proceedings, reckonings, remedies, rights, setoffs, suits, and sums of money, of any kind, whether any of the foregoing exist at common law, exist by statute, or otherwise, and whether known or unknown, whether matured or unmatured, whether absolute or contingent, whether direct or derivative, whether suspected or unsuspected, and whether liquidated or unliquidated (each, a "Claim," and collectively, the "Claims"), including, but not limited to, any claims for breach of contract, breach of any special relationship, breach of duty of care, breach of duty of loyalty, breach of fiduciary duty, concealment, conflicts of interest, conspiracy, control, course of conduct or dealing, debt recharacterization, deceit, deceptive trade practices, deepening insolvency, defamation, disclosure, duress, economic duress, equitable subordination, fraud, fraudulent conveyance, fraudulent transfer, preferential transfer, gross negligence, insolvency law violations, interference with contractual and business relationships, misrepresentation, misuse of insider information, negligence, breach of obligation of fair dealing, breach of obligation of good faith and fair dealing, breach of obligation of good faith, preference, secrecy, securities and antitrust laws violations, substantive consolidation, tying arrangements, unconscionability, usury, violations of statutes and regulations of governmental entities, instrumentalities and agencies, wrongful recoupment or setoff, or any tort, whether common law, statutory, or in equity, and including as a result of, or in relation to, any negligence of the other Party.

(b) Except as otherwise provided for herein, each Party hereby irrevocably waives and covenants and agrees to forbear and refrain from, directly or indirectly, asserting any Claim, or commencing, instituting, or causing to be commenced or instituted, any legal, arbitral, or equitable proceeding of any kind (whether actual, asserted or prospective) against the other Party based upon any matter released pursuant to this Agreement.

4. Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal,

or unenforceable in any respect in any jurisdiction under any applicable law, such invalidity, illegality, or unenforceability shall not affect the validity, legality, or enforceability of any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed, and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal, or unenforceable provision.

5. <u>Successors and Assigns; Third Party Beneficiaries</u>. The obligations of any Party under this Agreement may not be assigned without the prior written consent of the other Party, and any purported assignment in violation of the foregoing shall be void *ab initio*. Subject to the immediately preceding sentence, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement is intended or shall be construed to confer upon any Person other than the Parties and their respective successors and permitted assigns any right, remedy, or claim under or by reason of this Agreement.

6. <u>No Admission</u>. Nothing in or relating to this Agreement is intended or shall be construed as any admission by any Party regarding any Claim, allegation, liability, defense, or other factual or legal matter.

7. <u>Mutual Representations, Warranties, and Covenants</u>.

(a) This Agreement has been duly executed and delivered by each Party and constitute the binding obligation of such Party, enforceable in accordance with its respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other laws affecting creditors' rights generally and by principles of equity.

(b) The execution, delivery, and performance of this Agreement by each Party does not and will not violate any applicable law.

8. <u>Governing Law; Venue; Waiver of Jury Trial</u>.

(a) This Agreement will be governed by, and construed in accordance with, the laws of the State of Texas, regardless of the laws that might otherwise govern under principles of conflict of laws thereof. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against any of the Parties in the Bankruptcy Court, or, if the Bankruptcy Court does not have jurisdiction, in the courts of the State of Texas, County of Travis, or, if it has or can acquire jurisdiction, in the United States District Court for the Western District of Texas, and all of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere in the world.

(b) TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT, OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR

OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT AND THAT SUCH ACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

9. <u>Specific Performance</u>. Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each Party agrees that the other Party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof, without, except as may be required by law, the requirement of posting bond or other form of security, in any action instituted in any court of the United States or any state thereof having, in accordance with the terms of this Agreement, jurisdiction over the Parties, and the matter, in addition to any other remedy to which it may be entitled, at law or in equity. These provisions related to specific performance of the Agreement do not modify, impair, or in any way affect the venue-related provisions in § 8(a) of this Agreement.

10. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Parties with respect to the subject matter herein, and supersedes all prior agreements, understandings, representations, or warranties, written or oral, with respect to the subject matter herein by or between the Parties.

11. <u>Further Actions</u>. Each Party shall execute and deliver such documents and take such other actions as may reasonably be requested by the other Party in order to carry out the provisions of this Agreement.

12. <u>Knowing and Voluntary Waiver</u>. Each Party, by the free and voluntary act of signing below, each (a) acknowledges that it has been given appropriate time to consider whether to agree to the terms contained herein, (b) acknowledges that it has been advised to consult with an attorney and has consulted with an attorney prior to executing this Release, (c) acknowledges that it understands that this Agreement specifically releases and waives rights and Claims that it may have, and (d) agrees to all of the terms of this Agreement and intends to be legally bound thereby. The Parties hereto acknowledge and agree that each Party has reviewed and negotiated the terms and provisions of this Agreement and has contributed to its preparation (with advice of counsel). Accordingly, the rule of construction to the effect that ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement. Rather, the terms of this Agreement shall be construed fairly as to all Parties and not in favor of or against any Party based on the fact that such Party may have drafted such terms or provisions.

13. <u>Interpretation</u>. The Recitals are incorporated into this Agreement for all purposes. This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by each of the Parties. Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter; (b) words using the singular or plural

number also include the plural or singular number, respectively; and (c) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement. References to a Party are also to its successors and/or permitted assigns, if any. Unless specifically provided for herein, the term "or" shall not be deemed to be exclusive. The headings contained in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

14. <u>Counterparts</u>. This Agreement may be executed and delivered (including by facsimile or Portable Document Format (pdf) transmission) in counterparts, all of which shall be considered one and the same agreement and shall become effective when all counterparts have been signed by each of the Parties and delivered to the other Parties. Facsimile or pdf transmission of any signed original document or retransmission of any signed facsimile or pdf transmission shall be deemed the same as delivery of an original. At the request of any Party, the other Parties shall confirm facsimile or pdf transmission by signing a duplicate original document.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of October 23rd, 2017.

_____
Gregory S. Milligan, Trustee for the
BullionDirect, Inc. Litigation Trust

_____
Dillon Gage, Incorporated of Dallas
Name: Alisa Moen
Title: General Counsel

_____
Diamond State Depository, LLC d/b/a International Depository Services of Delaware
Name: Alisa Moen
Title: President

*Exhibit A*

to

Release Agreement

# LETTER OF INTENT
Platform Universe LLC and Dillon Gage, Inc.
October __, 2017

Dillon Gage, Incorporated of Dallas ("DG" or "Dillon Gage") and Platform Universe LLC ("Company" or "BU") have agreed to the mutually beneficial participation on the Company software platform. Subject to the terms of DG's Dealer Agreement, DG has agreed to provide product offerings for gold, silver, platinum and palladium bullion products which Company will integrate into the Company platform using certain DG APIs (the "Catalogue Sales"). Company will provide software development for the Company side of integration of the Dillon Gage APIs. BU will execute the dealer agreement with DG, and DG will grant BU a limited, non-exclusive and non-transferable license to Dillon Gage's software, if necessary. Integration will be implemented in phases. Phases may be modified and the order of implementation is contingent upon continual technical evaluation and recommendations. Work on Phase II will begin after successful completion and implementation of Phase I. This Letter of Intent is effective on the first day that is fourteen calendar days after the Bankruptcy Court has entered an order approving the Settlement Agreement and Release between Dillon Gage and Gregory S. Milligan, the Trustee for the BullionDirect, Inc. Litigation Trust and such order is not stayed under its own terms or any other order of the Court or of another court of competent jurisdiction (Effective Date).

## Phase I
### Direct Real-Time Pricing Feed
- DG will provide Spot Market and Chart APIs (up-to-the-second) enabling real time feed to the Company software platform and historical, intraday and ratio charts.

### Product Catalog
- DG will provide APIs to allow real time integration of product pricing and trading so that "sales" by the Company can be immediately offset by purchases from Dillon Gage, thus eliminating market move risk to the Company.
- DG will provide all necessary APIs to support Product Pricing and Transactions including, but not limited to:
  - GetPrice(s)
  - LockPrice(s)
  - ExecuteTrade
- DG will provide timely and necessary responses to API calls including status and confirmations.
- DG will recommend an initial "popular" product offering. DG will provide any available site content, such as product descriptions and images.
- DG will provide their best pricing tier to set premiums or prices for their products that will enable fair participation in the market by Company.

### IDS Storage / Fulfillment Option
Dillon Gage will provide fulfillment and storage at the IDS facility in Wilmington, Delaware on the following terms:

- Logistical support in shipping out products;
- No processing charge for the first 10,000 shipments (standard depository rate is $19.95/per package) thereafter discounted to $10. Does not include shipping insurance and postage which must be paid by the Company.
- This is included in the below inventory set-aside for BU's catalogue sales and all fulfilment services associated with that inventory – location (i.e. Dallas vs Delaware) will be at DG's discretion and most optimal geographic timing for fulfillment of catalogue orders. Parties will cooperate in offering a fully segregated storage opportunity to BU's clients and will work together to determine the most efficient client on-boarding. Product dependent value; Dillon Gage will commit up to $2M of product for the fulfilment of orders – (this includes, insurance, inventory carry costs, storage, hedging margin, lost opportunity costs).

1

# LETTER OF INTENT
Platform Universe LLC and Dillon Gage, Inc.
October ___, 2017

## Phase II
### Integration of Active Two-Way Market
Company will utilize DG's normal logistics processes and DG will work to provide continuous logistic improvements as commercially viable.

- DG will provide all necessary APIs to support Product Pricing (bid and ask) and Transactions (buy and sell) including, but not limited to:
    - GetPrice(s)
    - LockPrice(s)
    - ExecuteTrade
    - For processing any items to be received by DG, each such DG "buy" must be segregated and delivered to DG with a packing slip specifically identifying the product, total oz. and quantity, together with a trade confirmation number or other trade identifier.
- The Parties may elect to discuss and share for mutual benefit:
    - Product Validation Best Practices
    - Fraud Alerts regarding product counterfeiting and payment fraud.

## Option for Future Integration:
DG has offered an additional feature that will be considered by Company at a future date. There is no obligation for Company to implement this option.

### Reporting:
BU has agreed to provide regular financial reporting to DG, in substantially the same format as BU is providing to the Trustee, however, BU reserves the right to redact the identification of the source of data that is subject to confidentiality obligations.

### Implementation of IRA Component
IRA Connect platform - integrated IRA precious metals platform via NDIRA as a trustee.

Agreed and Executed:

Platform Universe LLC

*[signature: Cheryl L Huseman]*
Title: President

*[signature: C Josh Murph]*
Title: Vice President
Date: 10/25/2017

Dillon Gage, Inc.

*[signature]*
Title: COO

10/24/17
Title:
Date:

2