**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|                         |     |                          |
|-------------------------|-----|--------------------------|
| **In re:**              | §   | **CHAPTER 11 CASE**      |
|                         | §   |                          |
| **BULLION DIRECT, INC.**| §   | **CASE NO. 15-10940-TMD**|
|                         | §   |                          |
| **Debtor.**             | §   |                          |
|                         | §   |                          |

**INVESTIGATION REPORT BY GREGORY S. MILLIGAN, TRUSTEE FOR THE**
**BULLIONDIRECT, INC. LITIGATION TRUST**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Gregory S. Milligan (the "Trustee"), as Trustee for the BullionDirect, Inc. Litigation

Trust (the "Trust") established in the above-captioned case (the "Case"), hereby files this

*Investigation Report* (the "Report"), which describes the processes by which the Trustee

investigated the litigation claims and causes of action assigned to the Trust and discusses

Trustee's evaluation and disposition of those claims and causes of action.

**I.      Case Overview Prior to Trustee's Appointment**

1.      At the time of its bankruptcy filing on July 20, 2015 (the "Petition Date"),

BullionDirect, Inc. ("BullionDirect"), the debtor in the Case, was deeply insolvent, with

liabilities significantly exceeding assets.   BDI's bankruptcy filings listed approximately

$180,000 in cash on hand as of the Petition Date.  *Schedule B*, *In re BullionDirect, Inc.*, No. 15-

10940 (Bankr. W.D. Tex. Aug. 12, 2015).  Other assets, such as accounts receivable, equipment,

and inventory, were estimated to be worth approximately $300,000.  *Id*.  In addition, BDI held

approximately 237 ounces of gold, 32 ounces of platinum, and 22,010 ounces of silver in a vault

in Delaware.  *Joint Stipulation Regarding Contents of Vault*, *In re BullionDirect, Inc.*, No. 15-

10940 (Bankr. W.D. Tex. July 28, 2015).  At market prices as of the Petition Date, those assets

had a value of roughly $650,000.[1]  The total alleged value of BullionDirect's assets accordingly amounted to approximately $1,130,000.

2.    As for liabilities, BullionDirect stated that approximately $24 million was owed to customers of BullionDirect.  *See Amended Schedule F*, *In re BullionDirect, Inc.*, No. 15-10940 (Bankr. W.D. Tex. Sept. 18, 2015).  BullionDirect described these creditors as follows:

| BullionDirect's Description of Type of Claim | Net Amount of Claims |
|---|---|
| Cash Draw Request (Unfilled) | $943,639.90 |
| Pending Cash Creditors | $94,713.55 |
| Catalog Order (Unshipped) | $1,667,060.05, plus $21,530.01 |
| Ship-IRA-Active | $532,422.68 |
| Ship-Regular-Active | $6,682,465.35 |
| Portfolio-IRA-Active | $6,292,587.40 |
| Portfolio-Regular-Active | $7,615,961.77 |
| Portfolio-Regular-New | $198,020.34 |

*Id*.

3.    As indicated by these descriptions, many of these creditors had purchased precious metals through BullionDirect or advanced funds to BullionDirect, but deferred shipment of those metals and deferred repayment of those funds and instead left those assets in such customers' so-called "portfolios" with BullionDirect.  Other creditors had in fact requested shipments or "draws" from their "portfolios," but BullionDirect had not fulfilled those requests as of the Petition Date.  As indicated, many of these customers' "portfolios" were for individual retirement accounts ("IRAs").  Further, up until shortly before the Petition Date, BullionDirect had continued to hold itself out as a retail seller of precious metals from its "catalog," soliciting payments from customers for precious metals to be shipped immediately.  Some of the

---

[1] Calculated as follows: 237 ounces of gold at $1,213/oz., 32 ounces of platinum at $947/oz., and 22,010 ounces of silver at $15/oz.

BullionDirect creditors are customers who paid for immediate shipment but never received those shipments.

4.      Prior to the Trustee's appointment in the Case, most of the operating assets of BullionDirect, including its order-handling software and customer lists, were sold to Platform Universe, LLC ("Platform Universe") in exchange for a cash payment of $100,000 to the BullionDirect bankruptcy estate plus a commitment by the owners of Platform Universe to invest in Platform Universe and split any profits Platform Universe generates with BullionDirect or its successors. *See* Notice of Filing of Asset Purchase Agreement, filed May 6, 2016, Docket No. 167. The owners of Platform Universe, who were insiders or relatives of insiders of BullionDirect, or who had received transfers from BullionDirect, also received releases from litigation claims in exchange for this payment. *Id.*

5.      A chapter 11 plan was then confirmed in the Case which, among other things, established the Trust and transferred all remaining assets of BullionDirect to the Trust, including BullionDirect's cash and precious metals, its books and records, its Platform Universe profit-sharing rights, and the claims and causes of action held by BullionDirect and its bankruptcy estate. *See Amended Plan of Reorganization Filed by Debtor on June 14, 2016* (the "Plan"), as confirmed by the *Order Confirming the Debtor's Chapter 11 Plan Of Reorganization*, entered July 26, 2016, Docket No. 209.

## II.      Transition to the Trustee

6.      Upon being appointed as trustee of the Trust, the Trustee first worked with the bankruptcy specialists who advised and managed BullionDirect during the first stage of the Case to achieve a secure and orderly transfer to the Trust of the remaining assets of BullionDirect, including its books and records. The Trustee visited the office of BullionDirect on Lavaca Street

in Austin and the secured storage unit housing various computers and other equipment and catalogued and evaluated all of the personal property of the Trust at these locations. Working with his legal counsel and various information technology specialists, the Trustee made arrangements to retain the information contained electronically on these computers.

7. The Trustee liquidated the remaining precious metals that were transferred to the Trust by selling those metals at prevailing market prices. The net gain from these sales was approximately $870,000. *See* Chapter 11 Post-Confirmation Report for the Quarter Ending Dec. 31, 2016, filed Feb. 13, 2017, Docket No. 265.

8. Pursuant to the Plan and various orders of the Court, the Trustee used part of the cash on hand to pay chapter 11 pre-plan confirmation administrative expenses. *Id.*[2] The remaining cash held by the Trust at the end of 2016 was $588,015.32.

## III. The Investigation by the Trustee

9. After securing the assets of the Trust and liquidating all readily marketable Trust property, the Trustee focused on investigating the litigation claims and causes of action owned by the Trust.

10. The Trustee began his investigation by retaining legal counsel to assist in obtaining and analyzing evidence and information, and in identifying and developing potential litigation cases based on this information. The Trustee retained the law firm of Dykema Cox Smith, which had represented the Official Committee of Unsecured Creditors in the Case as well, and which accordingly had unique knowledge of the Case and surrounding facts. The Trustee also retained John W. Thomas, an experienced and well-respected Austin-based commercial trial lawyer who agreed to assist under a cost-effective fee arrangement that blended hourly

---

[2] Upon appointment, the Trustee received approximately $110,000 in cash from the Debtor, with more than $320,000 in unpaid Chapter 11 administrative claims approved by the Bankruptcy Court.

compensation with potential contingency fee compensation for litigation matters that Mr. Thomas chose to accept after the initial investigation.[3]  It should be noted that the Trustee was not able to find competent counsel who would agree to take every potential case on a contingency basis regardless of its merits, so the less desirable litigation matters would have required larger outlays for hourly or other fixed attorneys' fees from the limited resources of the Trust.

11.     Generally speaking, the investigation began by reviewing the books and records of BullionDirect that were available to the Trustee.  This review was appropriately tailored to reduce expenses, and in some instances non-lawyers were used to further reduce fees.  This initial review helped identify third-parties who could have important information, which the Trustee obtained through a combination of interviews and subpoenas for production under Federal Rule of Bankruptcy Procedure 2004.  More than a dozen such subpoenas were issued. The Trustee then reviewed this additional information to evaluate next steps.  In some instances, further interviews were conducted.  In other instances, oral examinations were conducted under oath pursuant to Federal Rule of Bankruptcy Procedure 2004.

12.     The remainder of this Report shall discuss the conclusions and results of this investigation with more specificity.  This discussion will be divided up among each class of potential defendant.

a)      **Claims against Managing Insiders**

13.     The Trustee believes there are a multitude of claims against the managing insiders of BullionDirect, specifically against its former CEO, Charles H. McAllister ("McAllister"), who

---

[3]   When initially hired, Mr. Thomas was a partner at George Brothers Kincaid & Horton LLP.  He started his own law firm during his representation of the Trustee.

has been has been indicted for federal wire fraud, among other things.[4]  These claims include

claims for breach of fiduciary duty, embezzlement and conversion, and fraudulent and

preferential transfers.

14.    Some of these claims against insiders had been released in exchange as part of the

sale of the operating assets for $100,000 plus other consideration prior to confirmation of the

Plan and appointment of the Trustee.  *See* Notice of Filing of Asset Purchase Agreement, filed

May 6, 2016, Docket No. 167.

15.    Along with assessing the merits of the remaining claims against managing

insiders, the Trustee also evaluated whether judgements could be collectible to properly analyze

the costs and benefits of pursuing those claims.  The Trustee accordingly conducted various asset

searches through public records and other means.  (The counsel for the Committee had done this

after the commencement of the Case as well.)

16.    These asset searches did not find meaningful non-exempt assets owned by

McAllister or other managing insiders or by related entities such as family trusts.  This lack of

discoverable assets comports with statements by various former employees that they were

unaware of direct embezzlement or theft by McAllister or other insiders.  Witnesses have stated

that BullionDirect was chronically unprofitable and funded years of ordinary operating losses by

spending customer funds.  BullionDirect spent most of the assets entrusted to it on employee

salaries and various other business activities such as software development and failed

investments in other business opportunities.  While the salary and bonuses taken by McAllister

were unreasonable given the circumstances, and while McAllister breached his fiduciary duties

---

[4] *See* Indictment, *United States v. Charles McAllister*, No. A-18-CR-0016-LY (W.D. Tex. Jan. 18, 2018)
(charging McAllister with wire fraud and engaging in transactions with criminally derived property and
seeking, among other things, a $16 million judgment against McAllister), attached hereto as ***Exhibit A***.

to BullionDirect, including misusing BullionDirect resources for his personal benefit,[5] and perpetrated fraud against BullionDirect's customers, the Trustee's investigation did not uncover evidence of outright theft from BullionDirect by McAllister or other insiders for their personal benefit.

17.    The Trustee has not spent the very limited resources of the Trust on comprehensive forensic accounting. BullionDirect operated for almost 15 years and conducted thousands of transactions each year. Obtaining and reviewing the source documents for these transactions would have been prohibitively expensive. Moreover, as discussed below, the Trustee has reviewed the books and records for insider transfers and has not found any unexplained transfers to insiders. The Trustee has also review random samples of ostensibly non-insider transfers without finding suspicious or unexplained transfers. Further, it should be noted that any insiders committing embezzlement would have had opportunity and motivation to conceal their theft by altering books and records, which further weighed against incurring the significant expense of a comprehensive forensic audit.

18.    On the other hand, McAllister restricted access to the BullionDirect vault to himself and a very small number of employees, and the ultimate amount of the precious metals in the vault is short by many millions of dollars. For example, McAllister or other insiders had the opportunity to walk out of the vault with precious metals and bury those metals somewhere. It could be all-but impossible to discover such intentionally concealed assets without cooperation. Such cooperation has not been forthcoming. McAllister has invoked his rights against self-incrimination and refused to testify in this Case and in ongoing government

---

[5] For example, in addition to helping himself to $35,874 in "severance wages" from the company shortly before the Petition Date, McAllister also "borrowed" funds from BullionDirect at various points during its operations.

investigations.[6] *See, e.g.,* Application for an Order to Show Cause, *U.S. Commodities Futures Trading Commission vs. Charles McAllister*, No. 16-9010 (W.D. Mo. May 23, 2016).

19.     The Trustee has accordingly refrained from spending scarce Trust resources on pursuing litigation against managing insiders who do not appear to have meaningful recoverable assets.  It should be noted that the Trustee could not find counsel who would undertake such a task on contingency fee arrangements, which would further increase the costs of this endeavor to the Trust.

20.     In addition, the Trustee has been aware that various federal agencies with far greater resources than the Trust have been investigating BullionDirect.  The Trustee has met with federal law enforcement and provided information and other assistance where requested.  These law enforcement agencies can obtain civil and criminal restitution for BullionDirect's victims from any assets that insiders may have concealed; the government is currently seeking a $16 million judgment in its criminal case against McAllister.

21.     Instead of spending Trust resources on a lawsuit against McAllister, the Trustee obtained an agreement from McAllister and various trusts related to McAllister agreeing to the indefinite tolling of applicable limitations periods for pursuing such claims and providing various representations regarding the lack of unknown transfers to such trusts by BullionDirect or its subsidiaries or other affiliated entities.  This ensures that the Trustee can commence this litigation if recoverable assets are discovered.

    b)     **Claims against Non-Managing Insiders**

---

[6] Approximately one year after the Trustee's appointment, and two years after the Case was filed, McAllister consented to a telephonic interview by the Trustee without the presence of any counsel or any audio recording of the interview.

22.     The Trustee also examined claims against shareholders and other non-managing insiders.  Potential causes of action such as fraudulent transfer and veil-piercing were analyzed.  The Trustee decided against pursuing such claims due to a lack of evidence of transfers.  The Trustee did not find evidence that BullionDirect paid dividends or made other transfers to its shareholders.  This precludes fraudulent transfer claims, which are predicated on transfers of value.  *See, e.g.,* 11 U.S.C. § 548(a)(1).  The apparent lack of transfers or other personal benefits to non-managing shareholders also undermines veil-piercing-type claims under Texas law.  *See* Tex. Bus. Org. Code § 21.223(b) (requiring a showing that the corporation was used to perpetrate actual fraud "for the direct personal benefit" of the shareholder to support a claim against the shareholder for a claim against the corporation).  Based on these issues, among others, the Trustee decided against spending very limited Trust resources to pursue such claims.

**c)      Claims against Business Partners**

23.     BullionDirect did operate in conjunction with various business partners such as vendors, contractors, and other service providers.  Unlike the managing insiders, certain of these business partners do appear to have substantial net worth.  The Trustee obtained a settlement with one such defendant worth at least $324,500 to the Trust.  *See Order Granting Motion under Bankruptcy Rule 9019 to Approve a Settlement Agreement between the Trustee and Dillon Gage*, entered November 25, 2017, Docket No. 280.

24.     However, generally speaking, claims against these third-parties require evidence that those third-parties either knew about the true nature of BullionDirect's operations and financial situation or received gratuitous transfers from BullionDirect.  For example**:**

- a recipient of an intentional fraudulent transfers is not liable if it provided value for the transfer and acted in good faith, 11 U.S.C. § 550(b)(1);

- a recipient of a constructively fraudulent transfer is not liable if it provided reasonably equivalent value for the transfer, *id*. § 548(a)(1)(B); and

- generally speaking, common-law claims against third-parties who conspired with BullionDirect or its insiders in committing tortious conduct, or aided and abetted such misconduct, are not strong where those third-parties lacked knowledge of the underlying misconduct.

25.     The Trustee has not identified any payments or other transfers to such business partners that were not for reasonably equivalent value.[7]  Further, the Trustee has not found evidence that BullionDirect disclosed its true financial situation to such non-insider third parties. BullionDirect's insiders instead actively concealed the true state of BullionDirect.[8]

26.     Two precious metal vendors apart from DillonGage did receive payments during the preference period, but based upon review of BullionDirect's books and records the Trustee believes these payments were not on account of antecedent debts, and instead were payments for substantially contemporaneous or subsequent shipments of precious metals to BullionDirect. *See* 11 U.S.C. § 547(b)(1) (requiring an antecedent debt owed to the creditor by the debtor as an element for a preferential transfer claim); *id*. § 547(c)(1) & (c)(4) (providing affirmative defenses to preference claims for creditors who provide new value either contemporaneously with or subsequently to such payments by the debtor).

27.     It is possible that certain BullionDirect creditors may have direct claims against certain of these business partners, such as claims for breach of various duties those partners may

---

[7] Legal precedent newly issued during the Trustee's investigation held that that the underlying lack of value resulting to any of BullionDirect's creditors from any of BullionDirect's operations was not relevant for determining whether value was exchanged with BullionDirect for fraudulent transfer purposes, and that instead "[v]alue exists when the debtor took consideration that had objective value at the time of the transfer, even if the consideration neither preserved the debtor's estate nor generated an asset or benefit that could be levied to satisfy unsecured creditors." *Janvey v. Golf Channel, Inc.*, No. 15-0489, 59 Tex. Sup. Ct. J. 587, 2016 Tex. LEXIS 241, at *41 (Tex. April 1, 2016).

[8] McAllister indicated in his June 2017 interview with the Trustee that BullionDirect never shared its true financial condition with such third parties.

have owed directly to those creditors. However, while some creditors have purportedly consulted with counsel about pursuing such claims, after inquiry by Trustee's counsel, no known lawsuit has been filed. Further, the Trustee may lack standing to assert such direct claims. *See, e.g., Ingalls v. Gressett (In re Bradley)*, 326 F. App'x 838, 839 (5th Cir. 2009) ("Even assuming that … all … creditors could properly assert the claim, we disagree that this fact alone confers standing on the Trustee."); *Hill v. Gibson Dunn & Crutcher, LLP (In re ms55, Inc.)*, 338 B.R. 883, 895 (Bankr. D. Colo. 2006) (noting that while claims directly in favor of the debtor's creditors may not be subject to the *in pari delicto* defense, the trustee lacks standing to bring such claims) (citing *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)). The Trustee did raise the issue of potentially amending the Plan to confer him with standing to pursue such creditor claims, but the limited precedent for this was tenuous at best and the Trustee accordingly decided against spending further Trust funds on this effort after a status conference with the Court on the subject in September 2016.

28. For all of these reasons, the Trustee decided against spending very limited Trust resources to pursue litigation against these other business partners.

**d) Claims against Professional Advisors**

29. The same general analysis for BullionDirect's other business partners applies to many potential claims against the third-parties who provided professional services to BullionDirect. In addition to claims for fraudulent and preferential transfer and common law aiding and abetting or conspiracy, the Trustee also considered claims for malpractice against BullionDirect's professional advisors.

30. BullionDirect does not appear to have obtained third-party professional accounting services after 2012, when BullionDirect's accounting personnel (who were purported

employees) resigned from BullionDirect after learning that BullionDirect's lawyers had advised the company to cease "using" (*i.e.*, spending) customer metals.[9]

31.     As for lawyers, BullionDirect appeared to employ a rotating cast of law firms, and it appears that each separate firm was only provided limited information about BullionDirect. For example, the law firm that provided legal advice against the use of customer metals apparently did not know the extent to which BullionDirect's operations were in fact funded by those metals, and a different law firm that may have had a fuller picture of BullionDirect's overall financial situation did not advise BullionDirect on its customer-facing operations, and also ceased performing services for BullionDirect after becoming aware of its overall financial services.  Thus, the Trustee does not believe that these professional advisors acted in bad faith or conspired with or aided or abetted BullionDirect's managing insiders.

32.     Further, the Trustee has not discovered incorrect legal advice from these third-party lawyers.  Instead, it appears that outside counsel did provide proper advice, but BullionDirect's managing insiders ignored this advice and replaced those attorneys.

33.     For these reasons, the Trustee decided against using the limited Trust funds to pursue litigation against the professional advisors to BullionDirect.

e)      **Claims against Customers**

34.     The Trustee also investigated claims against actual and apparent customers.  The possibility that some of the customer accounts for BullionDirect were falsified to provide cover for embezzlement or fraudulent transfers by BullionDirect insiders was investigated.  However,

---

[9] BullionDirect was advised in 2012 by legal counsel against continuing to "use" customer metals under a "use" clause in non-IRA customer agreements without adequate disclosure to customers.  BullionDirect ignored this advice, and instead threatened legal action against insiders who favored such disclosure, and who resigned in 2012 after learning that BullionDirect would not follow this advice.  BullionDirect ultimately did not disclose its true financial status to customers in 2012, and instead continued using customer metals to fund operations, including paying McAllister and other insiders.

BullionDirect had thousands of customer accounts and conducted tens of thousands of transactions in the years leading up to the Petition Date. While the Trustee did not review each and every one of these transactions and accounts, spot-checking random samples of transactions did not reveal transfers to fictitious persons, as determined based on internet searches and public records. Indeed, many transferees are listed as creditors. Based on this lack of evidence supporting potential fraudulent transfer claims against BullionDirect customers, the Trustee decided against pursuing such claims.

35.     The Trustee also considered whether to pursue claims against customers for the avoidance and recovery of preferential transfers. Several hundred thousand dollars of precious metals or cash were shipped to customers during the 90-day period for non-insider preferential transfers preceding the Petition Date. However, some of these shipments appear to be to contemporaneous cash buyers, and not on account of antecedent debts, which reduces the value of those claims. 11 U.S.C. §§ 547(b)(1), 547(c)(1) & (c)(4). Further, the records reviewed by the Trustee indicate that these shipments were all in the ordinary course of business. It does not appear that BullionDirect purposefully favored certain customer withdrawal requests over other requests, and instead generally processed requests during the preference period in a manner consistent with operations prior to the preference period. The apparently ordinary nature of these payments provides those customers with an additional defense that also reduces the value of those claims. *Id*. § 547(c)(2). Considering these apparent defenses, along with the generally distasteful prospect of suing the very people that BullionDirect defrauded, the Trustee decided against using limited Trust resources to pursue preference claims against BullionDirect customers.

          Respectfully submitted,

/s/ Jesse T. Moore
Jesse T. Moore
State Bar No. 24056001
Dykema Cox Smith
111 Congress Ave., Suite 1800
Austin, Texas 78701
Phone: 512-703-6325
Fax: 512-703-6399
Email: jmoore@dykema.com

**Counsel to Gregory S. Milligan, Trustee for the BullionDirect, Inc. Litigation Trust**

## Certificate of Service

I hereby certify that I served a copy of this Report on January 26, 2018 via the Court's electronic case filing system to all parties receiving notice through such system as listed below.

/s/ Jesse T. Moore
Jesse T. Moore

Steven B. Bass on behalf of Creditor United States of America
Steven.Bass@usdoj.gov,
lori.wilson@usdoj.gov

Duane J. Brescia on behalf of Interested Party C. Jack Murph
duane.brescia@strasburger.com,
donna.krupa@strasburger.com;Kathryn.Alexander@strasburger.com;bkrtcynotices@strasburger.com

Duane J. Brescia on behalf of Interested Party Cheryl L. Huseman
duane.brescia@strasburger.com,
donna.krupa@strasburger.com;Kathryn.Alexander@strasburger.com;bkrtcynotices@strasburger.com

Kay D. Brock on behalf of Creditor Travis County
bkecf@traviscountytx.gov,
kay.brock@traviscountytx.gov
Richard T. Chapman on behalf of Creditor

Janak Law Firm
rchapman@andersonsmith.com,
roxanne@andersonsmith.com;
Jamie@andersonsmith.com

Richard T. Chapman on behalf of Creditor Julius De Roma
rchapman@andersonsmith.com,
roxanne@andersonsmith.com;Jamie@andersonsmith.com

Richard T. Chapman on behalf of Creditor Linda Strande
rchapman@andersonsmith.com,
roxanne@andersonsmith.com;
Jamie@andersonsmith.com

Brent A. Devere on behalf of Creditor David Ray
bdevere512@aol.com

Kirstin K Dutcher on behalf of Creditor Chris Smelick
kkd@lawsonlaski.com, heo@lawsonlaski.com

Kirstin K Dutcher on behalf of Creditor Robert
Smelick
kkd@lawsonlaski.com, heo@lawsonlaski.com

Jeffrey R. Erler on behalf of Creditor Diamond
State Depository, LLC
jeff.erler@cottonteam.com,
Melissa.harrocks@cottonteam.com

Jeffrey R. Erler on behalf of Creditor Dillon
Gage Inc. of Dallas
jeff.erler@cottonteam.com,
Melissa.harrocks@cottonteam.com

Lisa C. Fancher on behalf of Creditor Kirk
Davis Mahon
lfancher@fbhg.law

Laura Marie Fontaine on behalf of Creditor
Diamond State Depository, LLC
Laura@HedrickKring.com,
Mckenzie@HedrickKring.com;Lori@Hedrick
Kring.com;Britt@HedrickKring.com

Laura Marie Fontaine on behalf of Creditor
Dillon Gage Inc. of Dallas
Laura@HedrickKring.com,
Mckenzie@HedrickKring.com;
Lori@HedrickKring.com;
Britt@HedrickKring.com

James V. Hoeffner on behalf of Creditor Louis
S McCann
jhoeffner@gdhm.com, bcumings@gdhm.com

Joseph D. Martinec on behalf of Debtor
BullionDirect, Inc.
martinec@mwvmlaw.com,
white@mwvmlaw.com

Jesse Tyner Moore on behalf of Creditor
Official Committee of Unsecured Creditors of
BullionDirect, Inc.
jmoore@dykema.com

Jesse Tyner Moore on behalf of Trustee
Gregory S. Milligan, Trustee of the
BullionDirect, Inc. Litigation Trust
jmoore@dykema.com

William T. Peckham on behalf of Creditor
Clinton C. Price
wpeckham@peckhamlawaustin.com,
calexander@peckhamlawaustin.com

Michael J. Pledger on behalf of Creditor
Christopher Lombardo
pledgerlaw@aol.com

Douglas J. Powell on behalf of Creditor David
Emery
notices@swbell.net,
dpowell@dougpowelllaw.com;ayana@dougpo
welllaw.com

Peter C. Ruggero on behalf of Creditor Kazu
Suzuki
peter@ruggerolaw.com

Stephen Matthew Schultz on behalf of Creditor
Peter Lettang
stephen@tslf.com

Martin Warren Seidler on behalf of Creditor
Gerard Barrack
marty@seidlerlaw.com,
ecfseidlerlaw1@yahoo.com

United States Trustee - AU12
ustpregion07.au.ecf@usdoj.gov

*Exhibit A*

**to**

**INVESTIGATION REPORT BY GREGORY S. MILLIGAN, TRUSTEE FOR THE**
**BULLIONDIRECT, INC. LITIGATION TRUST**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2018 JAN 18  PM 1: 24

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | CRIMINAL NO. |
| | § | |
| Plaintiff,  . | § | |
| | § | |
| v. | § | A18 CR0016 LY |
| | § | |
| | § | |
| CHARLES MCALLISTER, | § | [Vio: 18 U.S.C. §2 – Aiding & Abetting; |
| | § | 18 U.S.C. § 1343 – Wire Fraud; |
| Defendant. | § | 18 U.S.C. § 1957 – Engaging in Monetary |
| | § | Transaction in Criminally Derived Property] |
| | § | |
| | § | **SEALED** |
| | § | |

**THE GRAND JURY CHARGES:**

## INTRODUCTION

1.      The following entities were formed at the direction of, used by, and/or maintained by the defendant, Charles McAllister:

a.      Bullion Direct, Inc. (BDI) was a company founded by McAllister that was in the business of buying, selling, and storing precious metals for customers located throughout the United States. BDI was a web-based service that maintained a precious metal processing and storage facility that was headquartered in Austin, Texas, in the Western District of Texas. BDI began operations in August 1999 and continued operations until July 2015. The exchange managed by BDI was named Nucleo. As described on the BDI website, Nucleo was a "hub-centric" order matching system for precious metals.

b.      NBD Holdings, LLC, Nucleo Staffing, LLC, NUMIS Direct, LLC, the BDI Trust, and Nucleo Development Company, LLC, were subsidiaries of BDI during the course of the scheme.

INDICTMENT

Page 1

c.      Charles McAllister was the biggest shareholder and an officer of BDI during the course of the scheme. McAllister was the only person who could authorize the purchase of precious metals from wholesalers to fulfill orders at BDI. During the course of the scheme, BDI purchased precious metals from Dillon Gage, Hereaus, and other wholesale distributers.

d.      BDI had customers located throughout the United States. BDI allowed customers to buy and sell precious metals over the Nucleo platform operated by BDI. BDI charged both the buyer and seller a fee of 1% for each transaction over the website. BDI allowed customers to utilize IRA accounts when participating on the Nucleo exchange. All transactions involving BDI were conducted in the Western District of Texas, where BDI maintained a physical presence.

e.      BDI maintained a vault in Austin, Texas, in the Western District of Texas, to store precious metals. The precious metals stored in the vault were not segregated by customer, but maintained in pools for access by BDI.

f.      BDI also engaged in the sale of precious metals from its own account through a service they identified as catalog sales. BDI monitored current bullion prices and offered catalog items at "real-time" prices. BDI was obligated to purchase or obtain the bullion it offered via the catalog immediately after receiving the purchase request and money from a customer. According to the website, a customer had the option of taking immediate delivery of the bullion ordered or he could store it with BDI. During the course of the scheme, the number of catalog sales greatly increased the number of precious metal transactions through BDI and its exchange.

g.      BDI maintained electronic account information that allowed customers to check their precious metal account balances. BDI also allowed customers to maintain cash balances with BDI to facilitate future purchases of precious metals. The electronic account statements established by BDI purportedly showed each customer his balance for both cash and precious metal accounts, but BDI commingled customer funds and bullion with company funds and bullion during the course of the scheme.

h.      As part of the scheme to defraud, BDI utilized the pool of precious metal maintained in the vault for its own purposes. Rather than make immediate purchases of precious metals as represented to the customer and promised on the website, BDI used the money received from its customers to fund its business operations, invest in other companies, and pay personal expenses of McAllister during the course of the scheme.

i.      During the course of the scheme, BDI communicated electronically with customers throughout the United States regarding orders to buy and sell precious metals. Wire payments from customers to buy and sell precious metals were issued to BDI throughout the course of the scheme.

## THE SCHEME

2.      Beginning at least as early as January 2009 and continuing until in or about July 2015, McAllister, aided and abetted by others, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

3.      It was part of the scheme and artifice that McAllister, through BDI, would solicit individuals to purchase and/or sell precious metals. McAllister, through BDI, made false and

fraudulent promises, representations, material omissions and pretenses in connection with the scheme to defraud.

4.    It was part of the scheme and artifice that McAllister, through BDI, fraudulently acquired cash and assets for the following purposes:

      a.    to apply to the personal use and benefit of McAllister and his family;

      b.    to maintain an ongoing or expanding scheme in which he failed to purchase precious metals as directed by customers; and

      c.    to make payments and investments to benefit other businesses and entities not authorized by the customers of BDI.

5.    It was part of the scheme and artifice that McAllister, through BDI, transmitted and caused to be transmitted by others, including customers and those working on behalf of McAllister, by wire communications in interstate commerce, writings, signals, signs, pictures and sounds to and from the Western District of Texas to locations outside of the State of Texas.  These wire communications included, but were not limited to, the following:

      a.    telephone calls;

      b.    email communications via the internet;

      c.    electronic communications involving the clearing of checks and other financial transactions through the Federal Reserve banking system;

      d.    transfer by wire and electronic means of funds between financial institutions located outside the State of Texas and financial institutions in the Western District of Texas.

6.    It was part of the scheme and artifice that McAllister, through BDI, represented that the funds obtained from individual customers would be used to purchase precious metals on behalf of the customer and either shipped directly to the customer or stored in BDI's vault. Contrary to this representation, McAllister, through BDI, spent the money on BDI corporate expenses, other

investment activities, and McAllister's own personal use and benefit.

7.     It was part of the scheme and artifice that customers were lulled into the false belief that precious metals had been purchased and were stored in BDI's vault, when, in truth and fact, customer funds were used to pay for corporate expenses, investments in other entities, or applied by McAllister for his own and his family's personal use and benefit.

### COUNT ONE
### Wire Fraud
### [18 U.S.C. § 1343 and 18 U.S.C. § 2]

8.     Paragraphs 1 through 7 above are re-alleged and incorporated as though fully set forth here.

9.     From at least as early as January 2009 and continuing until in or about July 2015, in the Western District of Texas and elsewhere, Charles McAllister, aided and abetted by others known and unknown to the Grand Jury, having devised and intended to devise a scheme and artifice to defraud, as set forth above, to obtain money and property by means of false, misleading, and fraudulent pretenses, representations, and promises, and omissions of material facts, did knowingly cause to be transmitted by wire, radio, or television communication in interstate and foreign commerce, a wire transfer of funds, constituting and containing a writing, sign, signal, picture, and sound, for the purpose of executing and attempting to execute said scheme and artifice, on or about the date set forth below:

| Count | Date (on or about) | Description of Wire Transmission |
|---|---|---|
| 1 | April 13, 2015 | A wire transaction in the amount of $97,364 drawn on a Credit Suisse Securities account in New York, New York was deposited to BDI's Wells Fargo Bank Account xxx3787 in Austin, Texas, for the purchase of 80 Canadien Maple Platinum Coins. |
| 2 | June 17, 2015 | A wire transaction in the amount of $11,998 drawn on a Community America Credit Union Account in Kansas City, Missouri, and deposited to BDI's Wells Fargo Bank Account xxx3787 in Austin, Texas, for the purchase of silver coins. |

All in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

## COUNT THREE
### Engaging in Monetary Transaction in Criminally Derived Property
### [18 U.S.C. § 1957]

10.     Paragraphs 1 through 7 above are re-alleged and incorporated as though fully set forth here.

11.     On or about the dates set forth below, in the Western District of Texas and elsewhere, Charles McAllister, did knowingly engage and attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, which property was derived from specified unlawful activity, namely, Wire Fraud, contrary to 18 U.S.C. § 1343:

| Count | Date | Description of Monetary Transaction |
|---|---|---|
| 3 | July 2, 2015 | A transfer in the amount of $12,000 drawn on BDI's Wells Fargo Bank Account xxx3787 in Austin, Texas, to Nucleo Staffing, LLC, at Wells Fargo Bank Account xxx9352. |

In violation of 18 U.S.C. § 1957.

## NOTICE OF GOVERNMENT'S DEMAND FOR FORFEITURE

### I.
### Wire Fraud Violations and Forfeiture Statutes
[18 U.S.C. § 1343 subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C)]

As a result of the foregoing criminal violations set forth in Counts One, Two, and Three, the United States gives notice to Defendant Charles McAllister of its intent to seek the forfeiture of the below-described property upon conviction and pursuant to FED. R. CRIM. P. 32.2 and 18 U.S.C. § 981(a)(1)(C), which is made applicable to criminal forfeiture by 28 U.S.C. § 2461(c). Section 981 provides:

**18 U.S.C. § 981.  Civil Forfeiture**
**(a)(1)**  The following property is subject to forfeiture to the United States:
\* \* \*
**(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

This Notice of Demand for Forfeiture includes, but is not limited, to the property described in the paragraphs below.

### II.
### Money Laundering Violations and Forfeiture Statutes
[18 U.S.C. § 1957 and subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1)]

As a result of the foregoing criminal violation as set forth in Count Four, the United States gives notice to Defendant Charles McAllister of its intent to seek the forfeiture of the below-described property upon conviction and pursuant to FED. R. CRIM. P. 32.2 and 18 U.S.C. § 982(a)(1), which states the following:

**18 U.S.C. § 982.  Criminal Forfeiture**
**(a)(1)**  The court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

This Notice of Demand for Forfeiture includes, but is not limited to, the property described in the paragraphs below.

### III.
### Money Judgment

A sum of money equal to **$16,186,212.56** representing the amount of proceeds obtained directly or indirectly as a result of the violations set forth in Counts One through Three and representing the amount of property involved in the violations for which Defendant CHARLES MCALLISTER is liable.

### IV.
### Substitute Assets

If any of the properties described above, as a result of any act or omission of Defendant Charles McAllister:

    a. cannot be located upon the exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third person;
    c. has been placed beyond the jurisdiction of the Court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States of America to seek the forfeiture of any other property owned by Defendant Charles McAllister up to the value of said Money Judgment as substitute assets, pursuant to FED. R. CRIM. P. 32.2 and 21 U.S.C. § 853(p).

A TRUE BILL:

ORIGINAL SIGNATURE
REDACTED PURSUANT TO
E-GOVERNMENT ACT OF 2002

FOREPERSON OF THE GRAND JURY

JOHN F. BASH
UNITED STATES ATTORNEY

BY: _____
DANIEL D. GUESS
Assistant United States Attorney

INDICTMENT

Page 9